[No. 18863. Department Two. May 28, 1925.]

## A. J. BUSH et al., Respondents, v. KING COUNTY, Appellant.[1]

HIGHWAYS (61)—PRIMARY HIGHWAYS—DEFECTS—DUTY OF MAINTENANCE—LIABILITY OF COUNTIES—STATUTES. Under Laws 1917, ch. 118, p. 468, providing that each county should maintain a "permanent highway maintenance fund" for the upkeep of permanent and primary highways established within its limits by the state, to which fund moneys theretofore held by the state to the credit of the county for maintenance should be turned over to the county, which money was to be expended by the county for maintenance and repair of primary, permanent or like highways within its limits, the duty of maintaining such highways within the county and outside of cities is placed upon the county; and this duty was not affected by the act of 1921 (Rem. Comp. Stat., § 6330), creating a new primary highway fund, in view of Id., § 6312, creating a primary highway maintenance fund from collections to be credited to the several counties for paving and road construction of state primary highways, which was to be expended by the board of county commissioners; which act received a departmental construction placing the duty of maintenance upon the county.

NEGLIGENCE (16, 18)—WATERS (72)—FLOWAGE—ACTIONS FOR INJURIES—CONTRIBUTORY NEGLIGENCE—CARE REQUIRED AS TO USE OF PROPERTY. It is not contributory negligence, precluding recovery for obstructing a river and causing a washout, for the owner of farm land to fail to erect barriers in anticipation of the county's negligence in restricting the flow under a bridge and raising the highway by a fill, which gave way, washing out plaintiff's land.

Appeal from a judgment of the superior court for King county, Hall, J., entered April 15, 1924, upon the verdict of a jury rendered in favor of the plaintiffs, in an action for damages to property by flooding. Affirmed.

*Malcolm Douglas, Howard A. Hanson, Arthur Schramm, Jr.,* and *Ewing D. Colvin,* for appellant.

*John B. Hart, F. C. Kapp,* and *Griffin & Griffin,* for respondents.

[1]Reported in 236 Pac. 298.

MITCHELL, J.—The jury in this case returned a verdict in the sum of $6,500 for damages to the plaintiffs' farm lands caused by a flood in the Snoqualmie river in December, 1921. It was contended by the plaintiffs that the damages were caused by reason of the negligent manner in which the county of King constructed a bridge across the river in 1917 and thereafter maintained it, in conjunction with its construction and maintenance of the highway along the right bank or north side of the river through plaintiffs' farm. The defendant has appealed from a judgment on the verdict.

The county contended that the highway in question is a part of the Sunset Highway, a primary state highway, for the maintenance of which the state, not the county, is responsible. An adverse ruling of the trial court upon this point is presented as the first assignment of error. It is insisted by the respondents that the proof is insufficient to show that the highway was a part of the Sunset Highway, but, for the purpose of this case, we shall assume that it was so shown to be at the time the damages were inflicted. The Sunset Highway was first suggested and established by the legislature of 1913, Laws of 1913, p. 221 [Rem. Comp. Stat., § 6790], and thereafter in 1915, p. 485, § 2, and 1919, p. 267; Rem. Comp. Stat., § 6794. The record shows, without dispute, that many years prior to 1917 the county constructed and thereafter maintained a bridge and roadway at this same location, and that in 1916 and 1917 the present bridge was constructed at the expense of the county. It was completed and accepted in February, 1917, and about that time the county built up the roadway in low places along the north bank of the river, which, it appears, has been built up somewhat more each year.

Chapter 118, p. 468, Laws of 1917, created in each county a county fund to be known as the permanent highway maintenance fund in which there should be placed certain designated moneys received by it from the state, apportioned by the state auditor and remitted by his warrant, which moneys were to be expended for the ''sole purpose of maintaining and repairing primary and permanent highways or highways of like character and for equipment for the maintenance thereof.'' And notwithstanding the act provides that ''such highways shall be maintained under such rules and regulations and requirements as may be prescribed by the state highway board,'' we held that the county was liable for personal injuries occurring in 1920 on one of the permanent highways in King county, in the case of *McClung v. King County,* 119 Wash. 14, 204 Pac. 1064, saying:

''So that, at and before the time of this accident, King county had possession and control of funds designated by law to be used for the purpose of maintaining this and other highways, both permanent and primary, and we see no escape from the conclusion that from the time the 1917 act took effect, at least, the whole duty of maintaining this highway was upon the county, not as a direct agent of the state, but in its corporate capacity.''

And while in that case a permanent, rather than a primary, highway was involved, yet clearly the same conclusion would have been reached had it been a primary highway, because of the terms of the law to that effect as stated in the opinion.

It is argued, however, that the *McClung* case, *supra,* is not applicable here, nor the statute law as it then existed, for the reason that the legislature of 1921 amended the law as to the permanent highway maintenance fund (Laws of 1921, p. 250, § 2) [Rem. Comp.

Stat., § 6821], and created a new primary highway maintenance fund (Laws of 1921, p. 264, § 18) [Rem. Comp. Stat., § 6330], and thereby "took away from the county commissioners the maintenance of primary highways, leaving to them the maintenance of permanent highways." The fact that two funds were created to cover the two purposes where only one had been employed theretofore, is of itself unimportant as related to the present inquiry, therefore the act of 1921 amending the law as to the permanent highway maintenance fund need not be further considered. We must, therefore, look to the act of 1921 creating a primary highway maintenance fund to see if, as counsel contend, the county has been deprived of duty and jurisdiction in the maintenance of such highways and relieved of liability for damages caused by negligent maintenance.

The act is ch. 96, Laws of 1921, p. 251 [Rem. Comp. Stat., § 6312]. It is "An Act relating to the use of public highways and the rights and remedies of persons thereon, providing for the licensing of motor vehicles and collecting, distribution and expenditure of fees therefor, fixing penalties for violations thereof, etc.," and repealing certain laws. It is devoted mostly to rules of the road, equipment required for automobiles, license fees and the collection thereof through one central office for the whole state. It is, essentially, a motor vehicle act. Only one section, § 18, *supra*, touches upon the question involved in this case. That section creates in the state treasury a state fund to be known as the motor vehicle fund, and a state fund to be known as the primary highway maintenance fund. It provides that all fees collected under the act shall be paid into the state treasury and placed to the credit of the motor vehicle fund,

"from which shall be paid or transferred annually: First: One-half of the amount appropriated for the biennium for the motor vehicle department in the director of licenses' office for the issuing of licenses:

"Second: The amount required to be repaid to the counties entirely surrounded by water;

"Third: The sum of one million four hundred thousand dollars ($1,400,000), which shall be transferred and placed to the credit of the primary highway maintenance fund;

"Fourth: The balance remaining in the motor vehicle fund after the payments and transfers hereinabove provided for shall be applied annually to paving and general road construction of the state primary highways as provided by appropriation.

"The moneys in the primary highway maintenance fund shall annually be distributed, paid, used and transferred as follows:

"First: To each city of the first or second class in the state in which there are streets forming a part of the route of any primary state highway through such city, there shall be remitted by the state auditor, by warrant drawn on the state treasurer and payable from the primary highway maintenance fund, a sum equal to five hundred dollars ($500) per mile for each mile of primary highway in such city, to be expended for the maintenance and improvement of streets therein;

"Second: To each city of the third or fourth class in which there are streets forming a part of the route of any primary state highway through such city, there shall be remitted by the state auditor, by warrant drawn on the state treasurer and payable from the primary highway maintenance fund, a sum equal to three hundred dollars ($300) per mile for each mile of primary highway in such city, to be expended for the maintenance and improvement of the streets forming a part of primary highways therein; *Provided,* The Director of Public Works may give the city or town authorities permission to expend said maintenance money upon the other city or town streets;

"Third: To each of the counties in the state in

which are located primary highways there shall be credited a sum equal to three hundred dollars ($300) per mile for each mile of primary highway which is now or may hereafter be constructed on permanent location according to state specification;

"Fourth: Any balance that may remain in the primary highway maintenance fund after making the payments and credits hereinabove provided for shall be credited to the several counties, other than counties entirely surrounded by water, in proportion to the amounts of money paid into the permanent highway fund by the several counties.

"The moneys credited to the several counties, other than counties entirely surrounded by water, or so much thereof as may be necessary, shall be expended by the boards of county commissioners of the several counties under the direction of the director of public works, for the maintenance of the primary highways within the respective counties."

It is noticeable that subd. 4, relating to the motor vehicle fund, provides that the balance in the fund after payments and transfers provided for shall be applied annually to "paving and general road construction of the state primary highways as provided by appropriation." That is, moneys used for paving and construction of such highways, which work is of course done by the state highway board, requires an appropriation. No appropriation is required, however, for the moneys used for primary highway maintenance. These moneys are simply transferred to the cities and counties to be expended by the governing bodies of the cities and counties. The provision that, as to counties, the expenditures of the money by the board of county commissioners shall be under the direction of the director of public works does not deny or lessen the power and jurisdiction of the county in the matter of the maintenance of such highways and make it the subject of state jurisdiction any more so than did the

provision of the act of 1917, which act, as hereinbefore stated, was construed in the *McClung* case, that "such highways (permanent and primary) shall be maintained under such rules, regulations and requirements as shall be prescribed by the state highway board." That portion of the moneys collected and paid into the motor vehicle fund, under the act of 1921, which is for the purpose of paving and construction of state primary highways remains under the jurisdiction of the state to be expended by it according to appropriations made by the legislature, while as to that portion of such moneys that is to be used for primary highway maintenance, it is manifestly the policy of the act that those moneys, while paid into what is called a state fund, are so paid in the nature of a distributing agency for the cities and counties and are transferred and taken therefrom, not by appropriation of the legislature, but simply distributed, paid, used and transferred to the cities and counties, which become the owners thereof in the proportion and according to the plan provided by the act.

While a departmental or executive construction of an act of the legislature is not binding upon the courts, it is worthy of notice that by "Bulletin No. 1. The Rules, Regulations and Requirements for the Maintenance of Primary Highways as prescribed by the Supervisor of Highways pursuant to § 18, ch. 96 of the Session Laws of 1921, p. 264, of the State of Washington," introduced in evidence in this case by the county, it is provided that,

"The Board of County Commissioners of each county which includes any constructed section of primary state highway, whether constructed by state or county authority, shall make provision for the maintenance of every such section of primary highway within the county. They shall place the direct super-

vision of such maintenance in the County Engineer, or they may appoint a special engineer in charge of maintenance and such engineer shall have its direct supervision.''

We are of the opinion that the maintenance of those portions of a primary highway lying within the county outside of cities is a county duty and under the jurisdiction of the governing bodies, the county commissioners, of those counties.

Another assignment of error is that there was not sufficient evidence to take the case to the jury. The highway at the farm of respondents crosses the river over a bridge and turns east, running near the north or right bank of the stream. Respondents' lands lie on the north side of the river and above and below the bridge. A small part of their farm forms a triangular tract between the river and the highway. It is about 80 feet wide at the west and nearest to the bridge and runs to a point some three or four hundred feet east. No claim is made for damages to the triangular piece. The south bank of the river is higher than the north bank. The old bridge was built on concrete piers, one on each side of the stream at the edge of ordinary water. Wooden trestle approaches, sixty to one hundred feet on the south side, and about thirty feet on the north side, led to the ends of the bridge. The new concrete bridge has three arches, abutments, and two substantial piers in the stream. The former approaches on piling were replaced by solid earth fills in building the new bridge. There was testimony that the areaway for the passage of water was from twelve to twenty-eight per cent less after the new bridge was constructed than there was at the time of the old bridge, the percentage increasing as the water gets higher, and that gravel bars had accumulated about the bridge after the new one was built.

There had been a number of greater floods in the river, none of which, other than one in the year 1917, had damaged respondents' lands, but, on the contrary, had improved them by sediment placed on the lands. The flood of 1917, not as great as several in previous years, but greater than the one of 1921, washed out the road and caused a very slight washout on the farm immediately at the road. That damage was inconsequential. There were low places in the road across the farm through which, prior to the erection of the new bridge, the water at its flood stages passed, without any damage, around the bridge and back into the river channel below. When the new bridge was built, the roadway was raised across the low places on the farm, and after the flood waters of 1917 the roadway was further raised at these places, apparently serving as a dam to hold the swollen water hindered by the new bridge, until the water, at the time complained of, overcame the crown of the roadway and wore it away with such increasing volume and rapidity as to cause the waters to destroy some twenty acres of land of respondents by a deep washout in part and the deposit of sand and gravel from a few inches to several feet deep on other parts.

It was the contention of the county that a small stream called Raging river, which testimony showed supplied about .07 as much water as the Snoqualmie, that emptied into the larger river on the south side a short distance above the bridge, caused the damages complained of by its great flood waters at that time, and that the same result would have happened independent of the manner of construction and maintenance of the new bridge and roadway. As to which of the theories of the respective parties was the correct one was a question of fact for the jury, and there

being ample evidence to justify the verdict we are powerless to disturb it.

It is next assigned that the court erred in withholding from the jury the defense of contributory negligence, consisting of the alleged failure of the respondents to protect their premises from the overflow. The appellant supported by evidence its theory that the damage was caused by the alleged cross-current of Raging river, upon which the jury was instructed that, if the flood waters of the smaller stream united with those of the Snoqualmie in such a manner and with such velocity and rapidity as to create a current across the Snoqualmie and against its right bank, and that such current driving the flood waters against such right bank and towards the premises of the plaintiffs was the direct cause of the damage complained of, that then the verdict should be for the county. With this feature of the case eliminated, in connection with this assignment of error, it may be stated that, to require respondents to erect barriers against flowage over the raised roadway on the farm, caused by the reduction of the areaway for the passage of water under and around the bridge, would be to require them to anticipate and guard against the results of appellant's negligence. That contention is contrary to the rule as it relates to the use of property, as announced in *North Bend Lumber Co. v. Seattle,* 116 Wash. 500, 199 Pac. 988, 19 A. L. R. 415.

The verdict was not excessive. Judgment affirmed.

TOLMAN, C. J., MACKINTOSH, FULLERTON, and HOLCOMB, JJ., concur.