[No. 20344.   Department Two.   March 31, 1927.]

RUTHA OSBORNE, *Appellant*, v. WALTER GALUSHA *et al.*,
*Respondents*.[1]

[1] HIGHWAYS (66)—PRIMARY HIGHWAYS—INJURIES FROM DEFECTS
—LIABILITY OF COUNTY.   Under Rem. Comp. Stat., § 6330, as
amended in 1923 [Rem. 1927 Supplement, § 6330], taking from
the counties all the moneys which they theretofore obtained
from the state by virtue of the motor vehicle fund, and pro-
viding that the balance remaining in the fund, after the pay-
ments provided for, shall be applied annually to construction
and maintenance of state primary highways, a county has
no duty in regard to the maintenance and unkeep of primary
highways, established within its limits by the state; especially
in view of Rem. Comp. Stat., § 6830, providing that such high-
ways shall be maintained under such rules, regulations and re-
quirements as may be prescribed by the state highway board,
the state highway board having adopted no rules for the ex-
penditure of county moneys on such roads.

[2] SAME (68)—INJURIES FROM DEFECTS—ACTION—INSTRUCTIONS.
In an action for injury to a passenger in a bus, struck by a
falling tree, it is proper to instruct that the driver of the bus
was not negligent in operating his stage, because of the high
wind, where the complaint did not charge negligence in that
respect.

[3] SAME (68)—ACTION FOR INJURIES—NOTICE OF DEFECTS—INSTRUC-
TIONS.   In an action for injury to a passenger in a bus, struck
by a falling tree, standing off the highway, it is proper to
instruct that the operator of the stage had a right to assume
that the highway was reasonably safe for travel, and that he
was not called upon to investigate the condition of the tree to
see whether it might fall or be blown down by the wind.

[4] SAME (68)—ACTION FOR INJURIES—INSTRUCTIONS.   In an action
for injury to a passenger in a bus, struck by a falling tree, it is
proper to instruct that the driver of the bus was not negligent
because he did not stop the stage in a place of safety, where
there was no allegation of negligence with respect to a high
wind or continuing the journey because of the storm.

[5] TRIAL (14)—COURSE AND CONDUCT—REMARKS AND CONDUCT OF
JUDGE.   It is not unlawful comment on the evidence for the
court to state to the attorneys his reasons for rulings on the

[1]Reported in 254 Pac. 1086.

evidence, nor to interpose objections to the testimony, nor to put questions to the witnesses, nor to state that a witness was not qualified after the witness had himself so stated, nor to suggest the calling of the author of a book referred to and read from.

Appeal from a judgment of the superior court for Lewis county, Campbell, J., entered April 28, 1926, upon a verdict in favor of the defendants, in an action for damages for personal injuries. Affirmed.

*C. A. Studebaker, W. E. Bishop,* and *C. D. Cunningham,* for appellant.

*Poe, Falknor, Falknor & Emory, Don G. Abel,* and *J. H. Jahnke,* for respondents.

Bridges, J.—This is an action for damages on account of personal injuries. At the close of the case, the trial court dismissed Lewis county out of it, but submitted it to the jury as to the other defendants, in whose favor a verdict was rendered and a judgment of dismissal was entered, from which the plaintiff has appealed. We have had the benefit of elaborate and interesting briefs from all the parties. A somewhat detailed statement of facts is necessary and we will stress the testimony which is most favorable to the appellant:

On December 20, 1924, and for some time prior thereto, the respondent Galusha was the owner and operator of a passenger automobile stage running on the public road between the city of Chehalis and the town of Morton, both in Lewis county. It was being operated under a certificate of public convenience and necessity issued by the state. One Collins was the driver at the time of the accident hereinafter related and for some time prior thereto. The bus was capable of carrying eighteen passengers and had several compartments. The respondent United States Inter-

Insurance Association had, previous to the accident, issued to the respondent Galusha a statutory bond as required by law, providing for the payment of damages to passengers on account of negligence of the driver.

The stage left the town of Morton on the morning in question at about 7:30, the appellant going aboard there, to be carried to Chehalis. When the bus left Morton, the wind was blowing quite severely and so continued up to the time of the accident. Some thought the storm was exceedingly bad—one of the worst that had visited that country in many years. Others thought it was not unusually severe. The highway runs through what was at one time a timbered country, and there are still a good many trees standing along the roadside. From place to place, a number of passengers had been picked up, so that, at the time of the accident, there were seven of them. It was a cold day and there were some two or three inches of snow on the ground. The road, at least in places, was narrow, and turnouts had been provided. About ten o'clock in the forenoon, the stage was approaching one of these turnouts, and a truck had stopped there, waiting for the bus to pass it. The latter pulled onto the turnout and stopped to permit the truck to move farther forward in order that the bus might pass it, and just as the two automobiles were passing, a tree fell upon the bus, killing most of the people in it, the appellant being severely injured.

At the place in question, there were two roads close together, or rather two branches of the one road. The one which was being traveled by the stage was the older road, and apparently the only one which, during the winter, was capable of being traveled by autos. This old road was a little to the north of the tree which

fell. The road to the south of the tree was a new one and was made for the purpose of straightening the old one. It had only been graded, and during the dry season it was traveled somewhat. Between the two roads, stood the fir tree that fell. It was about two hundred seventy feet tall and more than five feet in diameter at the base. It was located on private property, thirty odd feet south of the old road and a short distance north of the newer road. The important fact in this respect is that the tree was on private property and not within the road right of way. The appellant produced considerable testimony to the effect that the tree leaned quite badly in the direction of the road. Many witnesses called by respondents thought the tree leaned very little, if any. Near the ground, it was decayed and rotten on the inside. There was some testimony to the effect that, at that point about seventy per cent. of its bulk was found to be rotten, or at least decayed. Other testimony tended to show that the decay was not so great. The tree was what is known as "stump rot" or "swell butt." When an experienced woodsman sees a swell butted tree, he suspicions that it is, to a greater or less extent, rotten and decayed. By sounding with an axe he can tell the approximate extent of the decay. It may be very much, or very little.

On the side of the tree opposite the road the stage was traveling, there was a scar with an opening through the bark, which to an experienced timberman would tend to indicate that the tree was rotten on the inside. This condition had probably been caused by some ancient fire. Originally the scar was doubtless much larger than it was at the time the tree fell, because nature in its effort to remedy the defect had nearly covered the scar over with new wood and bark.

This defective condition of the tree had existed for many, many years. A short distance above the ground the tree was perfectly sound. It was, of course, green at all times. It did not fall across the road at the nearest place, but fell pretty much in the direction it was supposed to lean, and particularly in the direction that the wind was blowing.

While the driver of the bus was maneuvering his car at the turnout for the purpose of getting by the truck that was there, this tree started to fall, giving forth a rather loud "crack" or groan. It struck another tree and its fall was impeded, so that probably fifteen seconds elapsed between the cracking of the tree and its actual falling to the ground. The driver of the truck (not the stage) saw the tree falling, leaped out of his auto and ran up the road and was uninjured. A man driving a small auto, which was following close behind either the bus or the truck, also heard the cracking noise, saw the tree falling, and backed his car out of the way and was uninjured. Both these men gave warning that the tree was falling, but the driver of the bus testified that he did not hear them and did not hear the cracking of the tree, and did not know it was falling until it struck his bus. It is conceded that the fierceness of the storm made a great deal of noise, and that it was somewhat difficult to hear. Both the driver of the bus and the respondent Galusha testified that they had never particularly observed this tree, did not know that it was leaning and did not know that it was swell butted or decayed. There was no testimony tending to show that the Lewis county officials had any actual knowledge that the tree leaned over the road, or that it was decayed, or that it was dangerous. The decay was covered by new growth.

[1] We will first determine whether the court erred in dismissing Lewis county out of the case. The com-

plaint alleged that the highway in question belonged to the county, and that it was at fault and guilty of negligence, in that it permitted the tree to stand as a menace to persons traveling the road. The county denied any knowledge that the tree was defective or that it was dangerous or likely to fall, or that it was in such condition as that its officers were bound to know that it was decayed, and alleged that it fell because of the very severe storm, and generally denied that the road belonged to it or that it had any duty whatsoever thereto.

We think there cannot be any doubt but what the road in question was one of the state's primary highways, and is a part of the National Park highway. The state has already extensively improved a portion of this highway, albeit quite distant from the place of this accident. The so-called new road or cut-off, which we have heretofore mentioned, was the work of the state, and the right of way for that portion of the road where the accident happened is now vested in the state and was so vested long before the accident here involved. The road is not, and has not been, a county highway. But appellant seriously contends that, even conceding that the road is one of the state's primary highways, yet there was a duty under the statute resting upon the county to maintain it, and this raises the most serious question, in so far as the county is concerned.

The appellant contends that, in the case of *Bush v. King County*, 134 Wash. 626, 236 Pac. 298, we held that it was the duty of King county to maintain a road of this character and that it was liable in damages to one who had been injured because of a defect in the road. We did so hold, and we rested our conclusion on § 18 of ch. 96 of the Laws of 1921, p. 264, which is

now § 6330, Rem. Comp. Stat., [P. C. § 213]. That section created in the state treasury a fund to be known as the "motor vehicle fund" and another fund to be known as the "primary highway maintenance fund." It provided that all fees collected by the state treasurer should be credited to the "motor vehicle fund" and from that fund annually paid or transferred to other purposes or funds, and particularly providing that $1,400,000 should be placed to the credit of the state "primary highway maintenance fund." From that fund, transfers were to be made, first, to cities of the first and second class; second, to cities of the third and fourth class; third, to counties in which are located primary highways; and fourth, any balance was to be apportioned to the various counties in proper amounts. It also provided that

". . . the moneys credited to the several counties . . . shall be expended by the boards of county commissioners of the several counties under the direction of the director of public works, for the maintenance of primary highways within the respective counties."

It was under this provision that we held that the county was obligated to maintain the state primary highway. But that statute is no longer in force. It was amended by ch. 181, Laws of 1923, p. 592. As so amended it provides for one state treasury fund, to be known as the "motor vehicle fund," and all fees collected by the state treasurer shall be placed to the credit of that fund, from which there shall annually be paid or transferred certain amounts to cities of the first and second class, and next to cities of the third and fourth class, and

". . . the balance remaining in the motor vehicle fund, after the payments and remittances hereinabove provided for, less any sums appropriated for admin-

istrative expenses in the office of the state treasurer, the department of licenses and the office of the state highway engineer, shall be applied annually to construction and/or paving and maintenance of the state primary highways, and the construction of secondary state highways, as provided by appropriation.'' [Rem. 1927 Sup., § 6330.]

It will thus be seen that, while the act of 1921 turned over to the various counties sums of money for the maintenance of primary highways, that course of conduct is completely changed by the Laws of 1923, p. 592, so that none of the money is turned over to the various counties, but is kept in the state fund and thence disbursed for the construction, paving and maintenance of state primary highways.

But the appellant claims that, by the 1923 act of the legislature, the counties, if relieved at all of the duty of maintaining primary highways, were relieved only to the extent of moneys which they had theretofore obtained from the state because of the motor vehicle fund, and that there still remains a duty on the county to help maintain such highways from funds which it otherwise has, and we are referred to ch. 118, Laws of 1917, p. 468 (§ 6830, Rem. Comp. Stat.,) [P. C. § 6827]. Section 5 of that act provides that:

''All primary highways when constructed shall be maintained at the expense of the permanent highway maintenance fund of the county in which such highway is located.''

It is difficult for one who is not an expert in state highway laws to tell with much accuracy just what statutes are in force and what have been repealed by implication or otherwise, and it is difficult for us to determine whether this law of 1917 is still in force. Certainly it is modified by the act of 1923, which takes from the counties all the moneys which they thereto-

fore obtained from the state by virtue of the motor vehicle fund. But whether there still remains in the counties a permanent highway maintenance fund and whether the counties are still obligated to use moneys from this or any other county fund to maintain or help maintain state primary highways, we will not here determine. This is a state highway, and it is the policy of the state legislation that all such highways shall be under the management and control of the state highway department. If the counties are still obligated to any extent to expend money for the maintenance of these primary highways, they must do so only under the direction and supervision of the state, because this same 1917 statute, on which the appellant relies, further provides that

". . . such highways shall be maintained under such rules, regulations and requirements as may be prescribed by the state highway board. . . ." [Rem. Comp. Stat., § 6330.]

In other words, if the county of Lewis is under any legal obligation to expend moneys for the maintenance of the highway in question, it may do so only under the general direction and supervision of the state highway department. The testimony shows that, at no time, has that department prescribed any rules or regulations for the expenditure of county moneys on this road or given the county any instruction with relation thereto.

We are of the opinion, therefore, that if, under the Laws of 1917, p. 468, the county of Lewis had any legal obligation to expend any moneys from any source for the maintenance of this highway, such moneys were to be expended and maintenance work done under directions, rules and regulations of the state, and that the county has not, therefore, violated any statute or

failed to perform any duty it may have had to the road in question. Nor is this holding contrary to what we said in *Bush v. King County, supra,* for, as we read that decision, it does not touch this particular point. A reading of the many highway statutes would indicate that it is now the policy of the legislature to make all primary highways entirely state roads, to be built and maintained exclusively by and at the expense of the state and without any interference by or aid from the counties. Whether this purpose has been completely accomplished, we need not here decide.

We hold that the county of Lewis was properly dismissed out of the action.

We must yet dispose of the appeal in so far as it concerns the owner of the bus and his bondsman. Appellant very bitterly complains about the instructions. We will take them in their order.

[2] By instruction No. 4, the court told the jury that they could not

". . . find the defendant Walter Galusha negligent merely because he operated his stage on the day in question on the highway, because of the wind."

But we think this instruction right under the pleadings. The complaint nowhere charges that respondents were negligent in operating the stage during the storm, and for that reason alone the instruction is right.

[3] By instructions Nos. 11 and 12, the jury was told that the operator of the stage had a right to assume that the highway

". . . was in a reasonably safe condition for public travel,"
and that
". . . the driver of defendant's stage was not called upon at the time of the accident to observe or examine or investigate the condition of any tree stand-

ing along, near or upon the public highway at the time and place in question to see whether the said tree might fall down or be blown down by the wind.''

And finally, by instruction No. 13, the jury was told

''. . . to disregard all testimony concerning the tree in question as to its soundness or leaning prior to its falling so far as the defendant Walter Galusha and the United States Inter-Insurance Association are concerned. There is no evidence that they knew of the unsound condition of it and there was no duty on the part of such defendants to examine or inspect the same.''

We think the court was right when he informed the jury that the owner of the stage had a right to assume that the highway was reasonably safe for travel. In a general way, we have very frequently so said. Appellant seems to concede that such may be the rule with reference to ordinary travel on the highway, but contends that it does not apply to the owner of the stage, who, being a carrier for hire, was bound to exercise the highest degree of care. But we see no reason why the state has not the same obligation to all travelers of the highway—to those who are rightfully carrying passengers for hire, as well as those who are traveling merely for their own convenience or pleasure. The rule so applied will not conflict with the other rule that the carrier for hire must exercise a high degree of care. As a matter of fact, in a number of instructions the court told the jury that the owner of the stage would be required to exercise toward the appellant ''the highest degree of care compatible with the practical operation of the bus in question.''

It may be that these instructions about presuming the highway to be safe are a little too general and are not correct in their entirety, because, if the driver of the stage actually knew of some impending danger or

of some defect in the highway, he would not, of course, be permitted to close his eyes and proceed upon the assumption that the road was safe. But such conditions do not arise in this case. There is no testimony whatsoever to show that either the owner of the stage or his driver knew that this tree was rotten or decayed, or was leaning, or was any more liable to fall than any other tree along the road. It certainly cannot be held that one driving on the highway, even though he be driving a bus carrying passengers for hire, must be active in looking out for trees off of the right of way which might fall, or go off of the road to investigate any such trees to determine their character. If that duty rests upon any person, it is upon the authorities whose duty it is to maintain the road, and not upon those who travel it. While the instructions given are sweeping, cover situations which do not exist under the testimony in this case, and may be broader than they should have been, yet they must be applied only to the facts of this case, and when so applied we are unable to see anything erroneous in them.

As a matter of fact, the case was submitted to the jury upon very narrow grounds, eliminating from their consideration practically everything except the incidents at the time the tree was falling. It will be remembered that there was testimony to the effect that, when the stage was on the turnout, and was there passing a truck, the tree fell; that it first gave a distinct crack, and snow fell on the top of the bus and there were other evidences that the tree was falling, and that some fifteen seconds of time elapsed from the time it started to fall until it struck the stage. Others who were very close to where the tree fell heard it crack, saw it falling, observed the direction it was coming, and had time to get out of the way. The appellant contended that the driver of the bus either heard or should have

heard the crack of the tree, and knew or should have known that it was falling, and that, had he exercised proper caution, he also could have gotten the bus out of the path of danger. This was the question, and practically the only 'question, which the court submitted to the jury, for in instruction No. 5 the court said:

"And if you further find from the evidence that after said tree started to fall and before the same struck the bus . . . the said Collins, the driver of the bus, had warning of the falling of said tree, or by the exercise of ordinary care could have had such warning, in sufficient time to have taken said bus out of the place of danger,"

had he conducted himself as he should under the circumstances, then the driver would be guilty of negligence, and the plaintiff might recover. On this particular phase of the case, the instruction was as favorable to the appellant as she could ask. And since the jury found against her, we must assume that they were of the belief that the driver was not guilty of any negligence in these matters.

We will not extend this opinion by discussing other instructions about which there is complaint. They are minor matters and besides we think the instructions correct.

Appellant asked the court to give a large number of instructions, and generally complains that almost none of them was given. It would extend this opinion too much to discuss them in detail. It must suffice for us to say that we have read them with care and do not find that the court erred in refusing to give them.

Although the record is very large, so far as the bus is concerned we think there were but two matters involved. First, were the bus owner and his driver bound to observe or investigate this tree which was

standing off of the right of way, to determine whether it was likely to fall, even in a storm? And secondly, the conduct of the driver at the exact time of the falling of the tree. The former question was in effect taken from the jury, and we think correctly under the particular facts of this case; and the latter was, we think, properly submitted to the jury.

[4] It is also urged that the court erred in refusing to permit the appellant to show that there were a number of places of safety along the road, and one in particular very near where the tree fell, where the stage might have stopped in perfect safety, and that whether it was the duty of the stage driver to stop at such places should have been submitted to the jury. We do not think there is any error in this regard. As we have said before, the complaint nowhere mentions a high wind, nor does it even intimate that the stage driver was negligent in continuing on his journey during the storm. Indeed, the appellant was hardly in any position to make this contention, for the storm was on when she took the stage and she knew that it was continuing.

[5] Appellant makes much complaint about the activity of the trial court in questioning various witnesses, and charges that time and time again he commented upon the testimony. She calls attention to many such instances. We have read the record carefully with reference to these matters, but will pass over, without comment, many of the things of this character about which complaint is made, and call attention to only those which seem to us to be of most importance.

In a good many instances the court gave his reasons for his rulings upon objections to the admission of testimony. Whatever he said in these regards was addressed entirely to the attorneys in the case. We

have so frequently held that such is not a comment
on the evidence, that we deem it unnecessary to cite
the cases. In a few instances the trial court himself
objected to questions which were put to some of the
witnesses. We cannot say that this was misconduct
or tended to prejudice the appellant, and certainly it
was not a comment on the evidence. The court is
something more than an umpire.` In other instances
the court, for a time, took the witness away from all the
attorneys and asked him questions. While this may
be somewhat unusual in this state, it is certainly not
such conduct as violates any rights of the litigants. In
our judgment, the only times when the court ap-
proached a comment on the testimony were the follow-
ing instances. A witness was being asked concerning
what caused stump rot and a swell butted tree. The
following occurred:

"The Court: You asked him what caused the stump
rot. I don't know that anybody knows. Mr. Cunning-
ham: I think they do, your Honor. The Court: A lot
may think they know. Mr. Bishop: I object to the com-
ment of the court. The Court: I think stump rot is
a good deal like cancer. Mr. Bishop: I object again
to your Honor's remark. The Court: This witness
does not know much about it. Objection sustained."

The witness had previously stated that he did not
know what caused a swell butted tree or what caused
stump rot, and the court objected to his testifying on
the subject because he was of the opinion that he knew
but little about it. In other words, the court held that
the witness had not qualified himself on this subject,
and so stated in very plain terms. We cannot see any
objection to this. It would have been better if the court
had not stated that he doubted whether anybody knew
what caused stump rot, but it cannot be said that it
was an unlawful comment on the testimony. At an-
other time one of plaintiff's attorneys read from a book

or pamphlet written by some person connected with the state university, and asked the witness if he concurred in that view. Upon objection being made, the court suggested to counsel asking the question that he had better bring the writer of the article as a witness. This was not a comment, and, to say the most of it, it would be only an erroneous ruling.

We have considered a few additional minor claims of error, but do not think they are serious or merit particular mention.

Being unable to find any prejudicial errors, the judgment is affirmed.

MACKINTOSH, C. J., TOLMAN, PARKER, and ASKREN, JJ., concur.