## MATTESON v. TECHE GREYHOUND LINES.*

### No. 16820.

Court of Appeal of Louisiana. Orleans.

Jan. 24, 1938.

Porteous, Johnson & Humphrey, of New Orleans, for appellant.

John E. Jackson and Baldwin J. Allen, both of New Orleans, for appellee.

McCALEB, Judge.

On March 13, 1936, the plaintiff, Mrs. Maude Matteson, was a passenger on an omnibus owned and operated by the defendant, Teche Lines, Inc., having boarded the same at Thibodaux, La., for transportation to Baton Rouge, La. While proceeding on this journey, the bus ran off the highway into a ditch, at a point in the road approximately 2 miles outside of Napoleonville, La., its rear right side striking a tele-

*Rehearing refused Feb. 7, 1938; writ of certiorari denied April 4, 1938.

phone pole situated adjacent to the ditch, which caused it to be thrown forward onto the middle of the highway where it completely overturned. As a result, the plaintiff was injured and she now seeks to recover damages against the defendant carrier in the sum of $10,008.

The defendant admits that Mrs. Matteson was its passenger; that it owed her the highest degree of care to transport her safely to her destination; and that the accident happened in the manner above described. However, it resists liability in the case, on the ground that its driver was confronted with a sudden emergency which was brought about solely through the reckless and careless act of the operator of another automobile and that its employee acted with prudence and caution and did all that could have been expected of him to avert the disaster. The emergency relied upon is the alleged presence of an automobile in the roadway, which was approaching the bus from the opposite direction, zigzagging and positioned, just prior to the accident, on the wrong or right-hand side of the road. Defendant avers that the situation of danger, thus created by the wrongful act of the driver of this oncoming automobile, was such as to require the operator of the bus to act suddenly for the protection of its passengers and that, accordingly, he, in order to avoid a head-on collision, was compelled to turn the bus over to the extreme right (off the pavement) and upon the muddy shoulder of the highway. It further alleges that it was raining; that the road was slippery; that its driver did not dare to employ the use of his brakes with full force for fear of skidding, but that he applied them gently; that the left front and rear wheels of the bus, which were then traveling upon the muddy shoulder of the road, slipped down into a ditch to the right of the road, and that the right rear side of the vehicle struck a post which caused it to veer back to the left upon the hard surface of the highway, where it capsized. Defendant further avers that its employee, by turning over to the right-hand side of the road so as to permit this car to pass, acted with care and caution in attempting to avert an impending collision with the automobile; that he was a highly skillful and competent operator; that the sole cause of the accident was the negligence of the driver of the oncoming car who brought about the sudden emergency and that the latter was evidently drunk.

On this issue, the case was heard and the judge a qua found for the plaintiff and awarded her damages in the sum of $1,500. The defendant has appealed and the plaintiff has answered, praying for an increase in the judgment.

It is obvious from the statement of the case that the defendant carrier cannot be absolved from liability unless it has shown, by a preponderance of evidence, that a sudden emergency, which was initiated exclusively through the negligence of a third person, confronted its operator and that he did everything possible (even though it was not the best thing to do) to protect its passengers from injury. See Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 97, 127 So. 376 and Hart v. Gulf, Mobile & Northern R. R. Co., La.App., 167 So. 166.

A carrier of passengers is not an insurer but it is required to exercise the highest degree of care, vigilance, and precaution for the safety of those it undertakes to transport and is liable for the slightest negligence. This so-called highest degree of care imposed upon the carrier is said to be affected by the character of the conveyance, its mode of propulsion, the usual course of its business, and the hazards of the particular situation. And, also, while it is undoubtedly true that a passenger must take the risks incident to the mode of travel and the character of the means of conveyance which he adopts, such risks are only those which cannot be avoided by the carrier by the use of the utmost degree of care and skill in the preparation and management of the means of conveyance. See 10 American Jurisprudence, vol. 10, pages 163, 171 and 172.

It is plain that a carrier by omnibus, because of its use of the public highways, is subjected to many more hazards of travel than a railroad. It is also certain that a person electing to use an omnibus in preference to a railroad assumes those risks which are ordinarily attendant to that mode of travel. One of the greatest hazards encountered by travel on the public highways is that of collision and if the carrier by omnibus is free from fault and an accident occurs exclusively through the negligent act of a third party using the highway, then the carrier is not liable to its passengers who may be injured thereby. See Gager v. Teche Transfer Co., La.App., 153 So. 69.

■ Bearing these principles in mind, we approach an investigation of the evidence submitted in this matter, for, after all, the law is simple and each case must stand upon its own particular facts. The scene of the accident is the state highway at a point approximately 2 miles from Napoleonville, La., in the direction of Donaldsonville, La. The width of the paved portion of the roadway is 18 feet and it is bordered on either side by a mud shoulder about 3 feet wide. The right-hand shoulder of the road, running in the direction the bus was traveling, tapers off into a drainage ditch, which is adjacent thereto. The locus of the accident is not far from a left-hand curve, which vehicles proceeding from Napoleonville are compelled to negotiate.

Clinton McWilliams, the operator of defendant's bus, states that he left Napoleonville at about 6:35 p. m. with seven passengers in the bus; that approximately 2 miles outside of Napoleonville there is an "S" curve in the road; that it had been raining all afternoon; that he had his lights on because of the darkness; that his windshield wiper was in operation due to the rain; and that he negotiated this "S" curve at a speed of approximately 35 miles per hour. He says that, just as he pulled out of this curve, he saw a car approaching from the opposite direction; that, from the distance it seemed to him that the car was on its own side of the road. He further states that he had previously sworn to himself that if anyone ever tried to crowd him off the road, he would hit them head-on but, upon seeing this oncoming automobile thus positioned, he felt that he should go over on the side of the road as far as possible. He asserts that he knew that the shoulder of the road was very slippery due to the rainfall but that, nevertheless, he turned his left front and rear wheels onto it in order to avoid a collision with the oncoming car; that he blew his horn and dimmed his lights and that after he had traveled some 25 or 30 feet on the shoulder of the road, the heavy bus (10 or 11 tons) slipped into the ditch and struck a telephone pole. The contact between the bus and the pole caused the bus to be shunted back onto the highway, where it overturned.

■ Conceding, for the purposes of discussion only, that McWilliam's statement of the casualty is substantially true, we feel that his explanation of the activating cause is insufficient to show that the emergency was brought about exclusively by the act of the driver of the oncoming car. The witness admits that he negotiated the curve in the road at 30 or 35 miles per hour. While such a speed is not unusual or unlawful under ordinary circumstances, we believe that, because of the slippery condition of the highway, resulting from the inclement weather, prudence should have prompted the bus driver to operate his cumbersome vehicle at a much slower rate. It should have been apparent to him that, in driving his bus at the admitted velocity, he could not safely stop within a reasonable time, in case of emergency, without endangering the lives and limbs of his passengers. He frankly concedes, in his testimony, that, when he was compelled to pull over on the shoulder of the road, because of the supposedly negligent action of the operator of the oncoming automobile, he was afraid that, if he did apply his brakes, his vehicle would skid. It is clear to us that had McWilliams, upon sighting the automobile approaching at some distance, retarded the celerity of his bus to 15 or 20 miles an hour, he could have safely brought it to a complete stop on the shoulder of the road within the space of time which ensued from the minute he observed that the oncoming automobile was out of control to the time it passed him. There can be no doubt that the driving of a motor vehicle on a rainy day over a slippery highway is in itself potentially hazardous because automobiles cannot be so readily controlled against skidding. The passing of traffic going in either direction, under the weather conditions prevailing in the instant case, is attendant with danger, and all drivers should have their cars under such control that an emergency stop can be made within a short space. Had McWilliams, when he first saw the automobile coming towards him in the distance, retarded his speed to such a slow pace so that his bus could have been stopped immediately, he would have, in a large measure, insured the safety of his passengers. This, in our opinion, was the prudent thing to do and, as he failed in this respect, he was guilty of fault which had causal connection with the emergency which he proclaims was subsequently created by the driver of the other car.

Aside from our conclusion that the defendant is responsible on McWilliams' statement alone, we find, from a review of all of the evidence adduced, that no emergency was created by the driver of the approaching automobile. In order to support

McWilliams' version of the affair, defendant produced several witnesses. Two of these witnesses were Jake Alexander and Dewey J. Ayo. These men were passengers on the bus. Like the plaintiff, they were injured in the accident but had compromised their damage claims prior to the time they testified in this case. They state that an emergency was created by the oncoming car and that, if McWilliams had not swerved onto the shoulder of the road, there would have been a head-on collision between the automobile and the bus. It is strange indeed that these witnesses should exonerate the defendant from liability after the carrier had settled their personal claims. Their statements, respecting the defendant's freedom from negligence, amount to admissions on their part that the money paid to them by the defendant was either a gift or was obtained under false pretenses.

The testimony of Henry Randall, another witness for the defense, is not convincing. He is supposed to have been walking on the road in the vicinity of the accident at the time it happened. He says that, just after the bus had passed him, he saw the other automobile coming from the opposite direction, zigzagging in the road, and that he had to step into the ditch in order to avoid being struck by it.

Gus J. Marquette, another defense witness, says that he was standing on the levee some 400 feet away from the point of the accident. Like Randall, he testified about the zigzagging car speeding on the wrong side of the road in the direction of the bus. We do not believe that this witness saw all that he claims to have observed.

Defendant also produced a Mrs. Marie Constanza and her son, Albert Constanza, who testified that they were traveling in their car about 100 feet or so behind the zigzagging car in the direction of Napoleonville. Their automobile is supposed to have been proceeding at a speed of 20 or 25 miles per hour and Mrs. Constanza says that she did not allow her son, who was driving her car, to pass the other automobile because she believed that it would be dangerous. It is to be noted that all of the defense witnesses, except the Constanzas, state that only one automobile passed the bus before it overturned. It is also apt to remark that the automobile, which is said by the defendant to have caused the sudden emergency, has never been discovered and that neither the make of the car nor the identity of its occupants is known, and, were it not for the Constanza's positive testimony, we would be tempted to declare that their automobile was the only one passing the bus immediately before the wreck occurred.

In contrast to the array of eyewitnesses produced by the defendant, the plaintiff's testimony, as to the manner in which the accident occurred, stands alone. We find her statement to be clear and explicit. She says that the bus was being operated at a speed of at least 50 miles per hour; that, just after the bus had completed the curve, it slid off onto the shoulder and into the ditch and that it struck something which caused it to be knocked back upon the highway, where it overturned. She admits that an automobile passed from the opposite direction about a minute before the bus slipped off the road, but says that she did not notice anything unusual about it.

The district judge was evidently convinced that the accident did not result from a sudden emergency created by the unknown automobile. We agree with his conclusion. We are also of the opinion that the real cause of the mishap was the speed of the bus upon the slippery road, which caused it to skid off the highway before the driver was able to fully complete the negotiation of the curve.

We next consider the damages suffered by Mrs. Matteson. When the bus was overturned, she was caught in the wreckage in an upside down position where she remained for approximately an hour and 45 minutes and it became necessary to remove a part of the side of the bus in order to release her from her imprisonment. Gasoline, mud, and water were dripping upon her face and body and the mental agony, as well as the physical pain and suffering which she endured, while she was pinned under this large vehicle, must have been well-nigh unbearable. In fact, while she was still held in the capsized vehicle, one of the window glasses of the bus was broken for the purpose of administering a hypodermic to her in order to alleviate her pain. After she was taken out of the wreckage, she was conveyed in an ambulance to the St. Josephs Hospital located at Thibodaux, where her injuries were diagnosed as brush burns in back, sprained and swollen right hand, wrist, and forearm, and abrasions of the left hip. She was confined to her bed in that institution until

March 24, 1936, when she was permitted to leave in order to obtain further treatment. She came to New Orleans and on March 26, 1936, consulted a specialist, Dr. H. Theodore Simon.

Dr. 'Simon makes the following statement of her ailment: "She came to my office March 26, 1936. She had evidence of multiple contusions of both of her lower limbs, her body and both upper limbs. These evidences were black and blue spots of varied sizes, due to subcutaneous hemorrhages. The right upper extremity was more severely traumatized. The right hand was severely bruised on its back or dorsal aspect, and the traumatism had apparently affected the joint of the wrist, the finger joints and the tendon sheaths which control the fingers and wrist. At this time the condition was so acute that I sent the patient to Hotel Dieu, where a plaster of paris molded splint was applied to her upper extremity. This was kept on constantly for a period of about two months and was removed daily for physiotherapy. The patient was seen until about the beginning of September, 1936, at which time I virtually discharged her from acute treatment. I have seen her off and on since with slight flare-ups of her joints. I saw her yesterday and examined her again yesterday."

The witness further says that Mrs. Matteson was a permanent disability consisting of a 10 to 15 degree lack of complete extension of the proximal or near joints of the fingers.

Plaintiff is a practical nurse by profession. At the time of the accident, she was employed by Dr. Beatrous in Thibodaux as a nurse for his children. She received wages in the sum of $50 per month, plus her board and lodging. We estimate the value of her board and lodging to be approximately $30 per month which, when added to her salary of $50, amounts to a total wage of $80 per month. As a result of this accident, she has lost the equivalent of this wage for a period of six months and should therefore be compensated in the sum of $480 on this item.

In addition to this, she has incurred bills for medical treatment amounting to $242 for which she is entitled to judgment.

The plaintiff has further testfied that the clothing she wore at the time of the accident, together with that contained in her suitcase, was so badly damaged from mud, water, and gasoline that it is no longer usable. She places a value on this clothing of $141, for which she should be reimbursed.

The three above items of medical expense, loss of wages, and clothing amount to a total of $863, representing actual damage incurred by plaintiff as a result of the accident. The district judge awarded her the sum of $1,500 as total compensation for her injuries and damages. Inasmuch as she has borne an actual expense of $863, the allowance of the court below for her pain and suffering and permanent injuries amounts to only $637. We believe that this award is inadequate in view of the injuries she received and should be increased to $1,000.

For the reasons assigned, the judgment appealed from is amended by increasing the amount thereof to $1,863, and, as thus amended, it is affirmed, with costs.

Amended and affirmed.