660

**HENNESSEY v. BURLINGTON TRANSP. CO. et al. (two cases).**

**HENNESSEY v. FRED M. MANNING, Inc. (two cases).**

Civ. Nos. 950, 951, 1009, 1010.

United States District Court,
D. Montana, Billings Division.

April 20, 1950.

M. J. Doepker, Butte, Mont., Hennessey & Hennessey, Billings, Mont., Frank B. O'Mahoney, Worland, Wyo., for plaintiff.

Coleman, Jameson & Lamey, Billings, Mont., Ernest J. Goppert, Cody, Wyo., for defendant Fred M. Manning, Inc.

Wood, Cooke & Moulton, Billings, Mont., J. C. Street, Denver, Colo., for defendant Burlington Transp. Co.

PRAY, Chief Judge.

The above-entitled civil actions, four in number, were commenced by the above-named administratrix of the estates of Lois Lorene Foster, deceased, and Violet Mae Stotts, deceased, as plaintiffs, against the Burlington Transportation Company, a corporation, and against Fred M. Manning, Inc., as defendants. As shown by the titles the first two actions are against the aforesaid Company as defendant, and the last two actions are against the other defendant, hereinafter referred to as Manning, Inc., and the former as the Burlington Company.

The actions are for damages resulting from the death of the above-named persons, occasioned by a collison between a bus of the Burlington Company and a truck and trailer of Manning, Inc., occurring, through the alleged negligence of both defendants, on U. S. Highway No. 20, about 9 miles north of Worland, Wyoming, on December 27th, 1946. The four actions growing out of the same accident were consolidated for the purpose of trial, and were tried to the court without a jury, and were later submitted for decision, upon briefs of counsel for the respective parties, filed after receipt by them of copies of the transcript of the evidence therein.

The evidence is voluminous, contributed to by many witnesses, wherein appear contradictions on material aspects of the case, and by reason thereof the attending circumstances will be found to be of importance in arriving at the facts. There seems to be general agreement that the highway north from Worland for a distance of 9 miles and more was icy, slippery and dangerous for travel at the time of the tragedy resulting from the collision, which occurred about ten feet north of a wooden bridge across highway No. 20, built over a drain ditch. There is a dispute as to the condition of the highway north of the bridge—some of the witnesses said that the icy and slippery condition extended only about 450 feet north of the bridge, and that beyond that point the highway was clear and without any snow or ice or other obstruction to travel, while other witnesses testified that snow and icy conditions ex-

tended for a long distance north of the bridge—one witness, who lived in the vicinity, said for a distance of four miles.

Counsel for Manning, Inc., contend that when the truck was about 425 feet north of the bridge the driver suddenly and unexpectedly encountered snow and ice and slippery conditions that help throw his equipment out of control, and that this is one of the principal causes of loss of control which, it is claimed, resulted in an unavoidable accident. But from the testimony of certain apparently disinterested witnesses, together with the circumstances, the court is inclined to believe that the icy, slippery and dangerous condition of the highway extended a much greater distance north of the bridge. The driver of the truck and trailer with his head at an elevation of about seven feet above the roadway could see plainly the dangerous conditions before him and the snow at the bridge, which because of the slight angle to the highway seemed to observers from both directions to be narrow, as they approached it, and no doubt when the driver observed the approaching bus from the south, brought the thought to his mind that there might be a meeting of the two heavy vehicles at the narrow bridge, and he endeavored to slow down by applying his brakes, but because of the evident speed at which he had been traveling, seemed unable to control his equipment, and the truck and trailer began to swerve and skid and later went out of control; had he been traveling at a rate of speed consistent with the slippery and dangerous condition of the highway he should have been able to avoid the meeting at the bridge. It appears that his equipment, according to the evidence, with the trailer unloaded, weighed over 38,000 pounds and was 45 feet in length, and to add to his predicament there is evidence to the effect that he at first applied the brakes to the truck instead of the trailer. The bus was said to be 35 feet in length and unladen weighed about 21,600 pounds, and at the time of the accident was carrying 18 passengers; several of whom lost their lives in the collision and fire which enveloped both vehicles.

From the testimony of Martin Lamb, who appeared to be an intelligent and disinterested witness, the last skid of the trailer began a rod north of the irrigation lateral, and that the driver was then over 425 feet from the place of collision; and observing the approaching bus he was negligent in failing to retard the forward movement of the truck and trailer and bring his equipment under control and to a stop within the 425 feet remaining before he reached the point of collision—unless the excessive speed which he had maintained before he found himself in difficulty was too great to be overcome. The violent impact, shake-up and shock to the passengers in the bus and damage sustained by both vehicles, furnishes strong evidence of excessive speed on the part of both drivers. In either event both drivers were guilty of negligence in not bringing their vehicles under reasonable control at a time when they were from eight hundred and fifty to about a thousand feet apart, under the conditions present in this case.

From the evidence it appears that the highway was practically level, except for a slight rise near the lateral, and could be clearly seen for at least a distance of a half a mile both north and south of the place of accident, so that no lack of visibility was present. Where a skidding automobile leaves its side of the road and passes over the center of the highway and into the traffic lane of vehicles traveling in the opposite direction, and "such skidding results from negligent acts or omissions of the driver, he is not absolved from the consequences of breach of the rule, although it is not deliberate or intentional. * * *" Wallis v. Nauman, 61 Wyo. 231, 157 P.2d 285, 288. In the same case it was further held: "where its skidding results from his negligence, the doctrine of 'unavoidable accident' may not be invoked to exempt liability for the consequences." Hunt v. Whitlock's Adm'r, 259 Ky. 286, 82 S.W.2d 364, 366. There is contradictory evidence as to what would constitute a safe rate of speed for travel by auto in view of the icy and slippery conditions existing. Mr. Wickam, a highway patrolman for the

State of Wyoming said that 30 miles an hour was the fastest he could drive in going to the scene of the accident; he had previously described the icy conditions he encountered driving north from Worland.

As evidence of speed, Mrs. and Mrs. Whiston, riding in the front end of the bus were thrown forward and out the front door and both rolled down into the drain ditch when the impact occurred. Mr. Whiston said when he observed the swerving of the truck that it seemed to him that the driver used the truck brakes instead of the trailer brakes; Mr. Whiston had driven large trucks over a period of 7 or 8 years and was familiar with air brakes. The last time he saw the speedometer of the bus "it was 30 miles, which was just before the bus got to the bridge, I would say." He said that when the truck swerved over into the bus's lane the bus driver swerved over to his left into the west lane. Jeannette B. Frost was sitting next to the emergency door in the bus; she said just before the accident the bus slowed down, she looked up to see what had happened and the crash occurred. Mrs. Frost described the crash: "It all happened immediately in a split second. It didn't seem any time at all between the time I looked up and the crash. It was the most ear splitting crash you ever heard, like the whole universe crashed—no explosion just a crash."

Mr. Brownell says he could stop in 250 to 300 feet; could see half a mile "fairly clearly"; he had 18 passengers out of Worland; "I didn't make full application of the brakes unless it was in the last five or ten feet before the impact." He said his speed was "15 and 20" miles an hour just before the impact. Sheriff Nicola said that he "came near piling up two or three times", because of icy conditions, driving from Worland to the scene of accident; he said skid marks of the bus showed from about the Piel mail box to the bridge; that the wheels were sliding as if an effort was being made to stop. Sam Dellos traveled over the highway north of the scene of the accident for about four or five miles an hour after it occurred and found the road covered with snow and ice, about the same as in front of the Martin Lamb house; he used a shovel on the emergency door of the bus but couldn't open it; he said a crow bar was used in an effort to open the door, but he couldn't say for sure about that.

Mr. Sinn, who lived about half a mile north of accident, traveled the highway for four miles north of the scene of the accident, about four hours before it occurred, and found it covered with snow and ice. Mr. Wright, a passenger in the bus, "did not observe any slackening of its speed up to the time of impact, it was running along smoothly, with a little pitching and vibration about 40, 45 miles an hour"; he made an effort to open the emergency door but was unable to do so, and this was confirmed by Miss Hanson, another passenger, who noticed a braking or slowing down of the bus just before the impact. Mr. Kreger, who drove 20 years for the Greyhound Company, said that "Any speed is too fast on icy roads"; said he could go perhaps 30 to 35 miles per hour over such roads.

Mr. Clinton, a witness and employee of defendant Manning, Inc., said he drove on the same highway, No. 20, the day of the accident, and at about 6:00 or 7:00 a. m., and that when "it was starting to get daylight", he struck the icy road; weather conditions had been warm before getting to the place where the ice had formed on the road when he was about 9 or 10 miles north of Worland.

"Q. Will you tell the court just what happened to you when you came off the rain covered pavement and on to the ice covered pavement that morning? A. Well we were driving along fairly fast and it was sprinkling and we ran on to this ice and it was really slick, couldn't hardly control the car, and from there on through Thermopolis we didn't drive over 10 miles an hour."

His experience driving a heavy truck and trailer covered approximately 15 years; he had driven equipment the same size of the truck and trailer in this case, and at the time and place above mentioned, on the day of the accident, he said that a reasonably safe speed for such equipment would

not have been over 25 miles an hour; Mr. Clinton said he was driving a Manning tool car on the morning in question.

The inability of witnesses to open the emergency door, directly following the collision, either from the inside or outside of the bus, and the failure to have suitable implements, such as an axe or sledge hammer, available near the emergency door, apparently resulted in the loss of several lives that otherwise might have been saved; it appears from the evidence that the implements for breaking down the door in an emergency were kept near the driver's seat in the front end of the bus. This unfortunate situation should be set down as another act of negligence on the part of the Burlington Company in not having the emergency door so adjusted that it could be easily and quickly opened by a passenger in an emergency, or at least, to have had implements available so that the door could have been broken down. It is in evidence that the bus burned so rapidly after the collision that it was with difficulty that any of the passengers escaped after the failure to open the emergency door, and the aforesaid Lois Lorene Foster and Violet Mae Stotts lost their lives in the collision and fire. As it seems to the court, it was an act of negligence on the part of the Burlington Company to use a bus for transportation of passengers constructed of such highly inflammable material. Surely the interior of the bus could have been constructed of material affording greater resistance to fire, so that the progress of the flames would be retarded in an emergency, such as was present in this case.

From a fair consideration of the testimony of the witnesses, and the impressive circumstances found to exist here, can there be any doubt that the speed of the two vehicles negligently contributed to the violence of the collision and caused the havoc that ensued which resulted in the death of the deceased persons above named? Pacific Greyhound Lines v. Rumeh, (Pacific Greyhound Lines v. Rhodes,) 178 F.2d 652, U. S. Court of Appeals, Ninth Circuit. It is apparent that the drivers in question must be declared to have been negligent in the operation of their respective vehicles, under the dangerous conditions existing for several miles both north and south of the bridge. There is present in this case a striking example of what may happen when the drivers of two heavy vehicles—one weighing 38,000 pounds and the other 21,600 pounds—seem to be trying to follow a time schedule when the roadway is covered with snow and ice, and in a slippery and dangerous condition for travel. The driver of the bus was charged with the exercise of the utmost care and caution for the safety of his passengers, and the driver of the truck had at least the duty of ordinary care in driving his heavy truck and trailer over the public highway, and both of them owed a duty to the public generally of reasonable care in the operation of such equipment which contributes so much to the volume of traffic on the public highways and the ever increasing danger of travel. Every person is bound to an absolute duty to exercise his intelligence to discover and avoid danger that may threaten him. Sullivan v. Northern Pacific Ry. Co., 109 Mont. 93, 94 P.2d 651.

Counsel for Manning, Inc., contend that the bus driver could have seen the truck and trailer in trouble at a distance of at least 850 feet, and that the driver of the bus should have slowed down and stopped, and that this was negligence on the part of the bus driver, and that such negligence was the proximate cause of the accident; and counsel for plaintiff agrees with this statement and in his reply brief retaliates by applying the same argument to the driver of the truck and trailer, all of which furnishes further support to the holding by the court that the combined negligence of both drivers was the proximate cause of the collision and fire, and consequent loss of life and property.

The question of earnings, as shown by the evidence herein, and what constitutes earnings should be considered. Counsel quoted Commissioner Callaway, later Chief Justice, who said: "Between the terms 'wages' and 'salary' there is no material difference when they are applied to the subject here under consideration. * * * The term 'earnings' is more comprehen-

sive than either of the others. It implies, as do they, that the sum due shall be claimed for the personal services of the claimant * * * but earnings need not result from work done under the direction of another * * *. They may, in proper cases, mean the services which one renders to himself. * * * One confers an advantage upon himself by striving for his own benefit, and looks upon his labor done in his own behalf as that which particularly furthers his interest and happiness." Dayton v. Ewart, 28 Mont. 153, 72 P. 420, 421.

It is in evidence that both Miss Foster and Miss Stotts, the victims of this tragedy, rendered service and support for the benefit of their parents and immediate members of their families, which would seem to constitute a contribution from their earnings whether the service consisted of work on the farm or in the household or the furnishing of needful commodities or money for their benefit, and these earnings and contributions, services and support, may be considered in connection with loss sustained in being deprived of the society, advice, care and comfort of the above named persons, and where the court finds for the plaintiff such damages will be awarded as seem to be fair and just to compensate the survivors for the amount of the pecuniary loss they have sustained.

As far back as 1852, in England, the rule, in like cases, was that damages would be limited to those that are pecuniary for losses sustained by survivors and heirs of the deceased. In a group of western States, including Wyoming and Montana, it appears that the measure of damages is directed by the Legislature to be in the amount that may appear to be just, without specification of the elements thereof. Some States have fixed a limit of recovery, such as Virginia to Ten Thousand Dollars. In Montana and Wyoming the principles applicable to the measure of damages is believed to be the same under all the Acts although there may be found to exist differences in phraseology, and that is to the effect that damages are measured by the pecuniary loss resulting to the beneficiaries of the action from the death of the person in question. Coliseum Motor Co. v. Hester, 43 Wyo. 298, 3 P.2d 105; Webb v. Denver & Rio Grande Western Ry. Co., 7 Utah 17, 24 P. 616, 618; Munro v. Pacific Coast D. & R. Co., 84 Cal. 515, 24 P. 303, 305; Chapter 104 of the Wyoming Session Laws of 1939.

On the subject of medical and funeral expenses the Circuit Court of Appeals for the Ninth Circuit held: "the weight of authority is to the effect that recovery can be had for medical and funeral expenses which have been paid by the beneficiaries, or for which they are liable, provided reasonable value thereof is shown, and provided it appears that the amounts charged are reasonable." Jutila v. Frye, 8 F.2d 608, 609, 17 C.J. 1338; 25 C.J.S., Death, § 108.

A carrier of persons for reward must use utmost care and diligence for their safe carriage, must provide everything necessary for that purpose and must exercise to that end a reasonable degree of skill. R. C.M.1935, Section 7815, and also the following from Section 7816 discloses a further duty: "A carrier of persons for reward is bound to provide vehicles safe and fit for the purposes to which they are put, and is not excused for default in this respect by any degree of care."

In the opinion of the court, it has been established by a preponderance of the evidence, that the proximate cause of the collision herein described, wherein the said Lois Lorene Foster and Violet Mae Stotts lost their lives, was the negligent acts and omissions by the defendants, Burlington Transportation Company and Fred M. Manning, Inc., and consequently the decision herein will be for the plaintiffs and against the said defendants, and, in view of that decision, as it appears to the court, a fair and just award in damages to the aforesaid survivors and heirs of Violet Mae Stotts, deceased, is the sum of Eighteen Thousand Dollars, to which will be added the reasonable funeral expenses in the sum of $731.50, being a total of $18,731.50; and as a fair and just award in damages to the aforesaid survivors and heirs of Lois Lorene Foster, deceased, the sum of Fifteen Thousand Dollars, to which will be

be added the reasonable funeral expenses in the sum of $921.95, a total of $15,921.95; and judgment for the aforesaid sums will be entered accordingly. Findings of fact and conclusions of law may be submitted, and forms of judgment. Costs will be awarded to plaintiffs herein. Exceptions allowed defendants.