**Mrs. Sam WILSON, Plaintiff,**

v.

**NORTHLAND GREYHOUND LINES, Inc., a corporation, Defendant.**

**Civ. A. No. 89.**

United States District Court
D. Montana,
Billings Division.

Sept. 30, 1958.

Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for plaintiff.

Longan & Jones and Neil S. Keefer, Billings, Mont., for defendant.

JAMESON, District Judge.

Plaintiff, a Montana resident, seeks damages from defendant, a Delaware corporation and a common carrier, for injuries sustained on December 23, 1955, while riding as a fare-paying passenger in defendant's bus on U. S. Highway 87, approximately 23 miles north of Roundup, Montana. Plaintiff had boarded the bus at Billings, Montana at approximately 6:00 o'clock A.M. The bus stopped at Roundup, 54 miles north of Billings, for five minutes about 7:15 o'clock A.M. The accident occurred about 8:00 o'clock A.M. It was daylight, but the lights of the bus were on.

Defendant's bus, a 37-passenger G. M. Coach, weighing ten tons, was 8 feet wide and 40 feet long, equipped with dual rear wheels and "single drivers in front." All the tires were in good condition, with good tread.

When the bus left Billings it was raining and as the bus approached Roundup the rain gradually turned to sleet and wet snow. Wet snow continued to fall between Roundup and the scene of the accident, where the roadway was covered with freshly fallen wet snow to a depth of three to four inches. The windshield wipers were on all the way from Roundup to the scene of the accident.

As Highway 87 leaves Roundup, headed northerly, it is hilly with intermittent dips and rises for approximately 18 miles and then proceeds in a nearly straight path across a level plateau for 4 or 5 miles to the top of a steep hill, which has a grade of six to eight percent. In descending the hill, the highway passes in a straight line through a cut for approximately 400 feet, then turns into an "S" curve, bending first to the right and then to the left. The pavement on the hill, and specifically at the scene of the accident, was approximately 22 feet wide, with a shoulder on the west side approximately 3 feet wide. The highway on the hill was very slippery.

The driver of the bus was familiar with the highway, the location of the downhill grade, the shape of the curve, and its surroundings. For five months preceding the accident he had traveled the route daily, except for his days off. Prior thereto he had often driven over the highway in relief during his 17 years of service with defendant.

As defendant's bus passed around the blind portion of the "S" curve, there was a coal truck parked off the highway on the east side headed south. As the bus passed this coal truck, the driver observed a car (hereinafter designated Alberta car) crossways in the middle of the highway at least 400 feet away.[1]

---

1. Cady, the bus driver testified that the coal truck was approximately 400 feet from the Alberta car; Hein, the driver of the coal truck and witness for plaintiff, that it was between 500 and 600 feet from the car. Mrs. Jones, a passenger on the bus and witness for defendant, first saw the Alberta car when the bus was "about a block and a half away."

The Alberta car blocked the right-hand lane of travel and extended into the left-hand lane, leaving 8½ to 9 feet of space between the car and the outer edge of the west shoulder of the highway.

The bus driver testified that, because of the slippery condition of the highway, he could not bring the bus to a stop on the highway without colliding with the Alberta car. He attempted to pass on the left (west) side, the shoulder gave way under the weight of the bus, the bus left the highway, proceeded in the borrow pit approximately 120 feet, and turned over on its left side. Neither the bus nor any of the other vehicles were equipped with chains.

The foregoing facts are undisputed. Plaintiff contends that defendant's driver was negligent (1) in traveling at an excessive rate of speed under the conditions existing at the time and place of the accident; (2) in failing to have his vehicle under proper control; and (3) in trying to pass the stalled car. Defendant denies all allegations of negligence and contends that the driver was confronted with a sudden emergency and at all times exercised the utmost care for the safety of his passengers. Plaintiff argues that the emergency was created by the negligence of the bus driver.

Under the Montana law a "carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." Sec. 8–405, R.C.M.1947.[2] Although the Montana statute imposes upon the carrier the duty to exercise "the highest degree of care," "it is but declaratory of the common law and does not constitute the carrier an insurer of the passenger's safety." Heck v. Northern Pacific Ry. Co., 1921, 59 Mont. 106, 113, 196 P. 521, 522. The Montana Supreme Court has not elaborated further on the meaning of utmost care. In California, which has an identical statute, it has been held that the degree of care required of a common carrier is the highest degree of care and diligence of a very cautious person and that even slight negligence will render the carrier liable for resulting injuries. Dodge v. San Diego Electric Ry. Co., 1949, 92 Cal.App.2d 759, 208 P.2d 37.

Did defendant's driver exercise the degree of care required by Montana law? While there is some confusion and conflict in the driver's own testimony, pertinent portions may be summarized as follows: After the bus crossed the plateau toward the top of the hill, it was traveling about 40 miles per hour. On the flat, between 5 and 6 miles from the top of the hill, it had met a Plymouth traveling "pretty slow",—not over 20 to 25 miles an hour. About one-fourth of a mile from the top of the hill it had met a truck which blinked twice (signifying, according to the driver, that the road was clear). As the bus approached the top of the hill, the driver shifted into third gear and started slowing down by means of motor compression and periodic application of brakes. At the top of the hill the bus was probably going 25 to 30 miles an hour and, as it went through the cut, about 15 miles an hour. As soon as the driver saw the parked coal truck, he shifted into second gear and, as he passed the truck about 400 feet from the Alberta car, the bus was traveling about ten miles an hour. As it passed the Alberta car, it

2. Montana statutory provisions applicable to all drivers of motor vehicles include: "(a) Every person operating or driving a vehicle of any character on a public highway of this state shall drive the same in a careful and prudent manner, and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation * * *.

"(c) The driver of every vehicle shall * * * drive at an appropriate reduced speed * * * when approaching and going around a curve, when approaching a hill crest * * * and when special hazard exists * * * by reason of weather or highway condition." Sec. 32–2144, R.C.M. 1947.

was traveling 3 miles per hour.[3] It is uncertain at what point the driver decided to attempt to pass the Alberta car. His testimony at various times indicated 100 to 150 feet and half-way between the coal truck and car. He testified that after he started down the hill he could not have brought the bus to a stop at any speed.

Hein, the driver of the parked coal truck, estimated the speed of the bus at 15 miles per hour as it passed the truck. He testified further that the bus went into a skid and slid to the left side of the road, and it appeared to him that it "skidded 50 to 75 feet before it went over the bank." Mrs. Jones, a passenger in the bus, testified that it was traveling "about 25" as it came over the crest of the hill, and 3 to 4 miles as it passed the Alberta car.

The bus driver testified that he could not see the Alberta car until he was at a point opposite the parked truck. Hein testified that it would be possible to see the car from the "right hand curve on the top" at the "north end of the cut."

With respect to other traffic at the scene of the accident, after the Alberta car became stalled, two coal trucks, both 8 feet wide and empty, traveling north, passed on the west side of the car. One reached the top of the hill and presumably is the truck the bus met about one-fourth mile south of the top of the hill. The other, driven by Hein, reached a point between 400 and 600 feet, from the Alberta car, where it parked off the highway on the east side. Hein testified that he was traveling about 10 miles per hour as he passed the Alberta car. A short time after the accident a car driven by Herman Frank, traveling north, (the same direction as the bus) collided with the Alberta car. Robert Payne, Highway Patrolman, arrived at the scene of the accident about 10:30. He testified that the highway was "icy" and that he did not attempt to stop his car until he reached the bottom of the hill. The Alberta car had then been removed. Neither Frank nor Payne testified regarding the speed of their respective vehicles.

There is little dispute with respect to either the facts or applicable principles of law. More troublesome is the problem of applying the principles of law to the facts. Each case must stand upon its own particular facts. Matteson v. Teche Greyhound Lines, La.App.1938, 178 So. 272, 274. While there are no cases involving identical fact situations, an examination of similar cases illustrates the very high degree of care required of a common carrier when traveling under adverse weather and road conditions.

The case perhaps most closely in point is Horsley v. Robinson, 1947, 112 Utah 227, 186 P.2d 592 where defendant's bus was traveling in the right-hand lane of a four-lane highway covered with ice and slush. A sleet of snow and rain was falling. A car approaching from the opposite direction suddenly went out of control and swung around so that it was in the traffic lane directly in the course of the bus. The car was going slowly in the same direction as the bus when they collided, resulting in injuries to plaintiff, a passenger in the bus. The Court held that the evidence would sustain a finding by the jury that the bus was going as fast as 40 miles per hour and was as much as 330 feet away from the car when it first became discernible that the latter was out of control and, on that basis, the jury could reasonably find that defendant's driver was guilty of negligence. The Court said: "The duty of the operator is to drive his vehicle at such a rate of speed that he can sufficiently control the same so that he does not foreseeably jeopardize the safety of his passengers. He is under this duty regardless of the size and weight of his vehicle and the road and weather conditions. Where the road and weather conditions are bad he must, in order to avoid being negligent, reduce his speed to a rate at which he

3. In his report to the Highway Patrolman about three hours after the accident, the driver estimated this speed at 5 miles per hour.

can operate it with reasonable safety." 186 P.2d at page 596.

In Tennessee Coach Co. v. Young, 1934, 18 Tenn.App. 592, 80 S.W.2d 107, a bus traveling in a drizzling rain at night ran into a mule which appeared on the road. In holding for the plaintiff, a passenger who was injured in the accident, the Court said: "It was the duty of the bus driver to operate the bus at such a rate of speed that he could stop without skidding, having regard to the slippery road, low visibility on account of rain, mist, etc." 80 S.W.2d at page 111.

In Buswell v. Missouri Pacific Transp. Co., La.App.1938, 184 So. 399, a connecting rod in a bus broke off and went into the steering gear housing so that the bus could not be steered. It traveled 308 feet from where the trouble should have been discovered, went through a guard rail and 90 feet farther before coming to a stop. The Court held that the bus was either traveling at an excessive speed or driver did not use his brakes and that, in either event, the driver was negligent.

In Matteson v. Teche Greyhound Lines, La.App.1938, 178 So. 272, defendant's bus ran off the highway into a ditch striking a telephone pole and overturning. Defendant contended that the cause of the accident was an automobile approaching from the opposite direction, zigzagging and on the wrong side of the road. It was raining and the road was slippery. The driver testified that he did not dare to use his brakes with full force for fear of skidding. The Court in finding for the plaintiff passenger held that, even assuming defendant's contentions to be true, the bus was not sufficiently under control for the conditions of the road, and that the real cause of the accident was the speed of the bus upon the slippery road.[4]

Brownell v. Fred M. Manning, Inc., D.C.D.Mont.1950, 102 F.Supp. 138, affirmed 9 Cir., 194 F.2d 102, and Hennessey v. Burlington Transp. Co., D.C. D.Mont.1950, 103 F.Supp. 660, were cases arising out of a collision between a truck and bus on an icy highway. The driver of the truck lost control of the vehicle when attempting to slow down so that he would not meet the bus on a narrow bridge. The bus was going from 35 to 40 miles per hour. Judge Pray held that both of the drivers were negligent in driving their vehicles at an excessive rate of speed for the conditions of the road and could have seen the danger of the narrow bridge when they were 800 to 1,000 feet apart and should have slowed down and stopped.[5]

4. The court said: "A carrier of passengers is not an insurer but it is required to exercise the highest degree of care, vigilance, and precaution for the safety of those it undertakes to transport and is liable for the slightest negligence. This so-called highest degree of care imposed upon the carrier is said to be affected by the character of the conveyance, its mode of propulsion, the usual course of its business, and the hazards of the particular situation." 178 So. at page 273.

5. The distance of 800 to 1,000 feet between two approaching vehicles is comparable to the distance of 400 to 500 feet where, as here, one of the vehicles is stationary. The following excerpts from Judge Pray's Opinion are pertinent:
"From a fair consideration of the testimony of the witnesses, and the impressive circumstances found to exist here, can there be any doubt that the speed of the two vehicles negligently contributed to the violence of the collision and caused the havoc that ensued which resulted in the death of the deceased persons above named? Pacific Greyhound Lines v. Rumeh (Pacific Greyhound Lines v. Rhodes), 178 F.2d 652, U.S. Court of Appeals, Ninth Circuit. It is apparent that the drivers in question must be declared to have been negligent in the operation of their respective vehicles, under the dangerous conditions existing for several miles both north and south of the bridge. There is present in this case a striking example of what may happen when the drivers of two heavy vehicles— one weighing 38,000 pounds and the other 21,600 pounds—seem to be trying to follow a time schedule when the roadway is covered with snow and ice and in a slippery and dangerous condition for travel. The driver of the bus was charged with the exercise of the utmost care and caution for the safety of his passengers, and the driver of the truck had at least the duty of ordinary care in driv-

In Leonard v. Pickwick Stages System, 1932, 120 Cal.App. 512, 7 P.2d 1059 a bus company was held liable for injuries incurred when a bus traveling between 20 and 40 miles per hour during a hard rain, while rounding a curve came upon silt which had been washed across the highway and skidded out of control.[6]

Among the cases holding for a defendant bus company is Karp v. Powers, 1929, 12 La.App. 518, 124 So. 781, where a bus going 5 or 6 miles an hour on a wet and slippery road slipped sideways into the ditch causing one passenger to fall upon the plaintiff. The driver was apprehensive of the danger and was held to be proceeding carefully. In Osborne v. Galusha, 1927, 143 Wash. 127, 254 P. 1086, 1089, a tree blown down by the wind fell on the bus killing several passengers. The court stated that one could assume that the highway was reasonably safe for travel, but also said that if the driver knew of impending danger he would not be permitted "to close his eyes and proceed upon the assumption that the road was safe." Defendant was not charged with the knowledge that the tree was rotten. However, in the instant case the driver was fully aware of the slippery condition of the road and the steepness and danger of the hill.

Even viewing the facts in a light most favorable to defendant, I am of the opinion that the bus driver was traveling at an excessive speed for the conditions of the road. The bus driver had seventeen years of driving experience. He was thoroughly familiar with the road. He had driven over 20 miles during which a wet snow had been falling. He saw the car crossways on the road when he was over 400 feet away. Yet, he was not able to bring the bus to a stop until he had attempted to get by the car and the bus had slid into the borrow pit and turned over.[7] The "exact rate of speed is of little importance. The pertinent question is whether the speed, whatever it may have been, was so excessive as to affect defendant's control over his car under the conditions which actually existed at that particular time and place * * * " [8]

Defendant contends that the stalled car presented a sudden emergency. It is true, where a person, without his fault, is confronted with a sudden emergency, he is not required to exercise that degree of care which is necessary when there is time for deliberation, but is required to act only as a reasonably prudent man would act under similar circumstances. Sullivan v. City of Butte, 1945, 117 Mont. 215, 157 P.2d 479. In

ing his heavy truck and trailer over the public highway, and both of them owed a duty to the public generally of reasonable care in the operation of such equipment which contributes so much to the volume of traffic on the public highways and the ever increasing danger of travel. Every person is bound to an absolute duty to exercise his intelligence to discover and avoid danger that may threaten him. Sullivan v. Northern Pacific Ry. Co., 109 Mont. 93, 94 P.2d 651." 103 F.Supp. 660, 664.

6. See also Nichols v. City of Phoenix, 1949, 68 Ariz. 124, 202 P.2d 201; 126 A.L.R. 1084, Annotation on "Liability of common carrier by motor bus or taxicab for personal injury to or death of passenger where condition of highway was the cause or a contributing factor."

7. In Horsley v. Robinson, Utah 1947, 186 P.2d 592, 597, the Court said: "Here

the driver had driven more than 20 miles under similar road and weather conditions which he encountered at the time of the accident. He had ample time to fully realize the amount of control or lack thereof which he could exert over the bus in case of an emergency. The driver must know that this highway would be burdened with much traffic, he as a reasonable prudent man must anticipate that vehicles would be constantly crossing and coming into his course of travel. Under such conditions he must anticipate that it would be highly dangerous for him to operate the bus at such a rate of speed that he could not stop or turn to one side sufficiently to avoid a collision with the Reinhardt car if it came into his course of travel 330 feet away."

8. Cowden v. Crippen, 1936, 101 Mont. 187, 53 P.2d 98, 103. See also McNair v. Berger, 92 Mont. 441, 15 P.2d 834, 839.

my opinion, the emergency rule is not here applicable. The negligence of the bus driver does not result from any choice or decision he made when he found he was going to strike the car if he continued in a straight course on his side of the highway. In fact, I find no merit in plaintiff's contention that the driver was negligent in attempting to pass the car on the left side of the highway, rather than driving into the car or off the road on the right side. The negligence consists of his inability to stop within a distance of more than 400 feet, caused by excessive speed or his failure to have the bus under control under the weather and highway conditions existing at the scene of the accident.

Passing now to plaintiff's injuries: Plaintiff was riding in an aisle seat on the left side of the bus three or four seats back. When the bus turned over on its side she was thrown to the left side of the bus. She heard some passenger tell another to put out his cigarette and was afraid the bus was going to catch on fire. Immediately after the accident she "hurt all over." She was helped out of the bus by the bus driver and Chet Hein, the driver of the parked coal truck, who took her to Roundup in his truck. Hein testified she appeared to be in pain and complained of her back. In Roundup Hein assisted her out of his truck and into the bus station (a restaurant) where she remained for several hours awaiting a bus to Billings. While in the bus station she was visited by Dr. O'Neil of Roundup, who gave her something to relieve the pain, and a waitress arranged a table and chairs so that she might rest more comfortably.

Plaintiff was admitted to the hospital upon her arrival in Billings at 6:20 P.M. and remained there until 1:05 P.M. the second day. It appears from the testimony of Dr. R. E. Brogan, supported by hospital records, that upon her entrance into the hospital her injuries were diagnosed as multiple contusions of the arms, legs and back, possible fractures, hysteria, and an anesthesia of the ulnar nerve. X-rays were taken of the left hip, left shoulder, left elbow, cervical spine, dorsal spine, and lumbar spine. All were negative except for minor abnormalities not attributable to the accident. The hospital chart contains the notation, "Patient extremely freightened until removed from overturned bus, as gasoline was thought to be spilling."

Plaintiff and her husband testified that for two months plaintiff was unable to perform her regular household duties and, after that period, continued to suffer some pain and disability. Plaintiff complained of difficulty in typing and her consequent inability to keep up with her duties as official of various organizations, particularly until April, 1956. It was her husband's recollection that he took her to her doctor about once a week during January, and that it might have "graduated off" to once every two weeks and that this continued until February. This was not corroborated by Dr. Brogan, the attending physician, who testified that following plaintiff's discharge from the hospital he saw her only twice, on December 31, 1955 and January 19, 1956, and that she came to his office alone on both occasions. Plaintiff consulted Dr. Brogan again in April, for the flu, but not for the injuries sustained in the accident.

On January 13, 1956, while brushing her teeth, plaintiff's right arm went limp and she lost control of the arm. According to plaintiff this condition has continued on occasions to the present time, although there has been some improvement. She testified as to instances where she had dropped dishes and other articles as a result of the numbness and loss of control of her right arm.

When plaintiff consulted Dr. Brogan on January 19, she complained of the numbness in her right arm. Dr. Brogan could find no organic condition. He made a diagnosis of hysterical paralysis, and referred plaintiff to Dr. Roney, a neurologist.

When Dr. Brogan saw plaintiff on December 31, he found the physical conditions much improved and slight improve-

ment in the emotional symptoms. On January 19, the physical findings were minor, but the emotional symptoms continued.

Plaintiff consulted Dr. Roney on January 19, 1956 and again on July 10, 1958, in preparation for trial. Dr. Roney's findings on January 19, 1956 were substantially the same as Dr. Brogan's, including the condition of the left ulnar nerve and a hysterical paralysis and anesthesia in the right arm. When Dr. Roney saw plaintiff on July 10, 1958, he found her organically sound "with no neurological disease or deficit." He felt "her difficulty with her hands and arms is a hysterical type of reaction" and could not say how long it might continue. It was his opinion that she was better emotionally than at the time of his previous examination on January 19, 1956.

Between her release from the hospital on December 25, 1955 and her consultation with Dr. Roney on July 10, 1958, the only consultations with any medical doctors concerning her injuries were those with Dr. Brogan on December 31, 1955 and January 19, 1956 and with Dr. Roney on January 19, 1956, aside from an examination made on behalf of defendant by Dr. Jess T. Schwidde, a neurologist on June 7, 1956.

Plaintiff consulted Dr. H. O. Harris, an osteopath, who treated her three times in April, six times in May, and once in June, 1956, once in December, 1957, and three times in January, 1958. The special damages total $332.55.[9]

At the time of the accident plaintiff was active on a voluntary basis in various political, fraternal, labor and civic organizations. While she experienced some difficulty in performing the duties of her various offices for a few months, her activities were not otherwise curtailed. At the time of trial she was Vice-Chairman of the Democratic State Central Committee, Secretary of Yellowstone County Trades and Labor Assembly Auxiliary, an active member of the Eagles Lodge, Secretary of Democratic Women's Club of Yellowstone County, and Welfare Chairman of the Federated Women's Clubs.

Plaintiff testified that her left arm still aches when it is cramped, that her neck hurts, and she has headaches. Her major complaint, however, is the intermittent numbness of her right arm, diagnosed by all of the physicians as hysterical paralysis. Was this condition proximately caused by the accident and, if so, what are its disabling effects?

The answer to this question involves a consideration of the emotional factors involved. There is evidence from Mrs. Wilson's own testimony and that of all the physicians who examined her, that at the time of the accident she was afraid the bus might catch on fire and there was deep concern and anxiety regarding her father's health, and subsequently a fear of pneumonia by reason of the fact that many of her family had died of that disease.

Plaintiff contends that the accident caused the condition in the right arm, relying upon the testimony of Dr. Brogan, the attending physician, who expressed the opinion that the accident was the cause. Defendants contend that the paralysis is due to a deep-rooted emotional disturbance, relying upon the testimony of the two neurologists, Dr. Roney, who testified for plaintiff, and Dr. Schwidde, who testified for defendant. Dr. Roney testified that an hysterical paralysis may be precipitated by "emotional shock, injury or anything." He was unable to determine the cause in this case. On cross-examination he testified:

"Q. Well, was it your opinion that the accident precipitated the emotional disturbance which you found in the patient? A. I was unable to determine it.

"Q. All right then, Doctor, you are not saying that your diagnosis was that her condition was caused by the accident, are you now? A. No."

Dr. Schwidde testified that the anxiety felt by plaintiff by reason of being unable

9. Services of physicians, $68; Hospital, $93.55; Osteopath, $171.

to see her father "could have been the possible cause, but I would have no evidence to make a definite link between those two to the exclusion of everything else; but that would be a possible cause, and there is some merit in considering it because the patient listed it as one of her greatest difficulties, indicating to me in her own words, 'this bothers me so deeply'."

I think it is fair to say that neither of the two neurologists, both well qualified, after careful examination of plaintiff, including a complete medical history, and a consideration of all of the emotional factors involved, was able to express an opinion with respect to the cause of the hysterical paralysis.

In response to a question as to whether his findings plus the complaints which plaintiff made to him were "such as to prevent her from doing ordinary housework from day to day," Dr. Schwidde replied that he did not feel from his examination "that she couldn't accomplish ordinary housework. However, she could be incapacitated in those by her psychological difficulties." There was no testimony from any of the physicians that the condition in the right arm would prevent plaintiff from performing her ordinary and customary household duties or the various outside activities in which she is engaged.

Under the Montana law the measure of damages "is the amount which will compensate for all the detriment proximately caused" by the accident, "whether it could have been anticipated or not." Sec. 17–401, R.C.M.1947. In personal injury actions there is no measuring stick by which to determine the amount of damages to be awarded and each case must depend upon its own peculiar facts. Pfau v. Stokke, 1940, 110 Mont. 471, 103 P.2d 673, 674; Jewett v. Gleason, 1937, 104 Mont. 63, 65 P.2d 3; 15 Am.Jur. 480, Damages § 71 (1938).

Aside from the medical and hospital expenses totaling $232.53, there is no accurate measurement for the recovery of damages. No loss of earnings or earning power has been shown. No help was hired to assist with either the household duties or outside activities. An allowance may be made for mental and physical pain and suffering. Bourke v. Butte Electric & Power Co., 1905, 33 Mont. 267, 83 P. 470. Disability resulting from the injury may be considered provided it can "reasonably be said to have followed as the proximate consequence of the injury * * *." 15 Am. Jur. 478, Damages § 70. One is also entitled to compensation for the destruction of the capacity to pursue an established course of life, apart from loss of earning capacity. Montague v. Hanson, 1909, 38 Mont. 376, 99 P. 1063. However, in the instant case, plaintiff's activities do not appear to have diminished since that accident and in some areas seem to have increased.

The general rule regarding the proof required to establish causal connection between an accident and the injury claimed is stated by Corpus Juris Secundum as follows: "Plaintiff must prove by legally sufficient evidence that all the injuries for which he claims damages are properly attributable, in a medical sense, to the accident. While plaintiff need not establish such causal connection with certainty, he must do so with reasonable certainty or by a preponderance of the evidence. A mere guess or conjecture on the subject, expert or otherise, is not sufficient, nor should difficulty in establishing the proximate cause of an injury prompt the court to dispense with proof thereof; but the jury may infer the cause of an injury from the facts proved. There can be no recovery for an injury or condition which the evidence shows might have resulted from two or more causes, for only one of which defendant is responsible. So, too, it is not sufficient for one seeking damages for a condition claimed to have resulted from an accident or injury to show that such accident or injury might or could have caused the condition; other causes should be ex-

cluded." 25 C.J.S. Damages § 162, pp. 822–824.[10]

 It is not necessary that the extent of the damages be proved with the same definiteness as the cause of the injury. The following comments in the Restatement of the Law of Torts are pertinent:

"There is, however, no general requirement that the injured person should prove with like definiteness the extent of harm which he has suffered as a result of the tortfeasor's conduct. It is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful conduct of the person charged. It is desirable, likewise, that there should be definiteness of proof as to the amount of damage as far as is reasonably possible. It is even more desirable, however, that an injured person shall not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered." * * * Section 912, Comment a (1939).

It is true, as suggested by plaintiff, that it is for the trier of the facts to determine the weight to be given expert testimony, as well as other evidence. Weakley v. Cook, 1952, 126 Mont. 332, 249 P.2d 926. In this case I feel I must accept the testimony of the two neurologists. Viewing their testimony, and particularly that of Dr. Roney, plaintiff's own witness, in the light most favorable to plaintiff, the most that can be said is that the accident was "a possible cause" of the intermittent hysterical paralysis of the right arm. The testimony clearly does not exclude other possible causes.[11]

 Plaintiff suffered multiple contusions in the accident, including a contu-

sion of the left ulnar nerve; but the physical symptoms were "very minor" within a month after the accident. Plaintiff was partially incapacitated from performing her household duties and outside activities for a few months. There is evidence of both mental and physical pain and suffering, including fright at the time of the accident. Plaintiff still complains of headaches and aches in her left arm and neck, but there was no evidence that these are disabling or interfere with plaintiff's normal activities.

In my opinion, $1,500 will fairly compensate plaintiff for the injuries caused by the accident. Pursuant to Rule 11(b) Rules U.S.Dist.Ct.D.Mont., plaintiff shall, within ten days, prepare and file draft of judgment and serve a copy upon defendant.

---

10. See also 15 Am.Jur. 487–488, Damages, §§ 76, 77; Restatement, Torts § 912 (1939); Bush v. Chilcott, 1922, 64 Mont. 346, 215 P. 1001; Bearman v. Prudential Ins. Co. of America, 10 Cir., 1951, 186 F.2d 662; May Department Stores

Co. v. Bell, 8 Cir., 1932, 61 F.2d 830; Scott v. United States, D.C.N.D.Fla.1955, 127 F.Supp. 422.

11. See also Bearman v. Prudential Ins. Co. of America, 10 Cir., 1951, 186 F. 2d 662.