## HIGGINS v. UNITED STATES et al.

### Civ. A. No. 11099.

United States District Court
E. D. New York.

Aug. 6, 1953.

George W. Martin, New York City, and Herman E. Hoberman, Brooklyn, N. Y., for plaintiff.

Frank J. Parker, U. S. Atty., for Eastern District of New York, Brooklyn, N. Y., by Eli Resnikoff, Asst. U. S. Atty., New York City, and Gerard E. Molony, Asst. U. S. Atty., Brooklyn, N. Y., for the United States.

Thomas P. Curtin, New York City, by Robert Curran, New York City, of counsel, for defendant Edward Staffe.

RAYFIEL, District Judge.

The plaintiff sues the defendants to recover damages for personal injuries sustained by her as a result of the collision

of two motor vehicles, one a pleasure car owned and operated by the defendant Staffe, in which the plaintiff was a passenger, and a mail truck owned by the United States government, and operated by one Philip LaPorte, a government employee. The collision occurred on August 17, 1950, between 12:30 and 12:45 A.M., at the intersection of 94th Street and 23rd Avenue in Jackson Heights, Queens, New York. The plaintiff bases her claim on the negligence of the operators of both vehicles, and sues the United States of America under the Federal Tort Claims Act, 28 U.S.C.A. § 1346.

The defendant Staffe had demanded a trial by jury, but just prior to the commencement of the trial he waived the jury and consented, as did the plaintiff, that the action be determined by the Court.

At the commencement of the trial plaintiff's counsel informed the Court that she had married after the action was begun and moved to amend the title of the action to Gladys Louise Higgins Alar, as plaintiff. This motion was granted.

The plaintiff testified that she had met Staffe at about 12:30 A.M. on August 17, 1950, at 82nd Street and Roosevelt Avenue, Jackson Heights, and there entered his automobile, sitting immediately to the right of Staffe, who was driving. It was their intention, she testified, to proceed to La-Guardia Field, where she was to board a a plane which was scheduled to leave at 1:05 A.M. for Missouri, where she was to visit her parents. She testified further that she was unfamiliar with the streets in the vicinity and the route Staffe followed but that immediately prior to the accident she saw the hangars and lights of the airfield directly ahead of her. Ninety-fourth Street is a two-way street, 50 feet wide, running north and south; Twenty-third Avenue is a two-way street, running east and west, and is divided by a center mall into two lanes each 32½ feet wide, one reserved for eastbound and the other for westbound traffic. The airport lies to the north of the intersection. There were "stop" signs at the northeast and southwest corners of the intersection, facing easterly and westerly respectively.

There was sharp conflict in the testimony of Staffe and LaPorte as to the manner in which the accident occurred. They agreed that when the vehicles came to a stop immediately after the accident both were in the roadbed of 94th Street, at the intersection, and facing north. However, that was their only point of agreement. Staffe testified that he was proceeding north on 94th Street, using his lower beam headlights and traveling at about 20 to 25 miles an hour; that as he approached the intersection of 23rd Avenue he decreased his speed; that he did not see the mail truck, which he said was traveling west on 23rd Avenue, until the time of the collision.

LaPorte testified that on the night in question he was making his regularly scheduled run from the General Post Office at 32nd Street, between 8th and 9th Avenues, in Manhattan, to LaGuardia Field, where he was to deliver a load of mail at 12:45 A.M.; that just prior to the accident he was proceeding north on 94th Street along his designated route, his dim lights on, at about 20 miles an hour; that as he approached the intersection of 23rd Avenue he slowed down to about 15 or 18 miles an hour; that he saw Staffe's car to his left, traveling east on 23rd Avenue, and about 75 to 100 feet west of 94th Street, at which time his truck was about 75 feet south of 23rd Avenue; that Staffe's car was traveling at approximately 50 miles per hour; that as he reached the intersection he saw Staffe's car, which he characterized as a "flash", coming through the "stop" sign on the southwest corner, causing the accident.

Thus we have each of them (Staffe and LaPorte) testifying that prior to the accident he was driving north on 94th Street toward the airport, and that the other was proceeding along 23rd Avenue. According to Staffe's version LaPorte was driving west and under LaPorte's Staffe was driving east. Each accuses the other of failing to comply with the "stop" signs. They could hardly be in greater disagreement.

Because of the sharp conflict in the testimony it becomes necessary to examine the physical facts with the greatest care. In order to accept Staffe's version I would

have to believe that LaPorte, for no apparent reason, and in clear violation of his orders, deviated from the specific route prescribed for him by his superiors. It becomes even more difficult to accept his version when it is realized that for LaPorte to be east of the intersection, traveling west, as Staffe stated, LaPorte would be coming, not from Manhattan, as he said he was, but from the opposite direction. At no time during his prescribed route from the Post Office in Manhattan to the airport was he required to be east of 94th Street.

I have carefully examined the exhibits, especially the photographs, some of which were taken shortly after the accident occurred. The latter show the cars involved and some surrounding area and the others show the vicinity of the intersection of 94th Street and 23rd Avenue. The photograph marked defendant Government's exhibit "D" shows the two vehicles in the position in which they were immediately after the accident. It confirms the testimony that they were facing north. In the upper lefthand corner of the exhibit there is a sign, apparently on a pole, with a white arrow, pointing upward, on a black background, containing the words "LaGuardia Domestic Terminal", occupying three lines. Below it there appears an arrow of the type sometimes placed upon poles by the City of New York. There is a pole to the right of the sign and arrow. Staffe's car, with the mail truck to its right, stands in front of and to the right of the pole. The same sign and arrow may be seen on a pole in Government's exhibit "K", which is a view of 94th Street, facing north, showing its intersection with 23rd Avenue. The said sign, fastened to a pole, faces south, as does the sign in exhibit "D". When examined under a magnifying glass the sign reveals the same legend, "LaGuardia Domestic Terminal", occupying three lines, as appears in exhibit "D". Such examination also discloses an arrow affixed to the pole below the said sign. Exhibit "K" also shows a pole situated to the right of the one to which the sign and arrow are attached, and this photograph makes it apparent that these two poles are located on the northeast corner of 94th Street and 23rd Avenue. It seems clear, therefore, that immediately after the accident both vehicles came to a stop at the northeast corner, facing north, at a point to the right of the pole on the corner containing no sign, and I find Staffe's version irreconcilable with such a conclusion. It would seem impossible for the vehicles to reach such a position if they were traveling in the direction Staffe testified.

On the contrary, the position of the vehicles after the accident bears out LaPorte's version that the mail truck was proceeding north on 94th Street; that Staffe's car, traveling east on 23rd Avenue at an excessive rate of speed, disregarded the "stop" sign located at the southwest corner of the intersection, traversed more than one-half of the width of the roadbed of 94th Street, and struck the left front side of the mail truck, swerving to his left (north) in an apparent effort to reduce the force of the impact, while LaPorte swerved to the right, (east) for the same purpose.

By reason of the foregoing it is my opinion that LaPorte was proceeding north on 94th Street, following a prescribed route with which he was familiar; that he saw Staffe's car traveling east on 23rd Avenue and approaching its intersection with 94th Street; that, knowing there was a "stop" sign on the southwest corner, controlling eastbound traffic on 23rd Avenue, he relied, as he had a right to do, on the fact that Staffe would obey the "stop" sign. In the case of McLean v. McKinley, decided June 9, 1953, 282 App.Div. 138, 122 N.Y.S.2d 154, 156, Presiding Justice Peck stated: "The purpose of a "Stop" sign is to require a vehicle approaching an intersection to stop at the corner or at least pause at a point where visibility is adequate to assure safety in undertaking the crossing." The Appellate Division, Third Department, in the case of Armstrong v. Koller, 261 App.Div. 1017, 25 N.Y.S.2d 984, speaking of a "stop" sign, said, at page 986, "However, it did require a driver to stop whenever there was traffic on Route 40 at or near the intersection."

502

■ I therefore find that the accident was caused solely through Staffe's negligence in disregarding the "stop" sign and in operating his automobile at an excessive rate of speed and in a reckless manner.

I find that the plaintiff was free from contributory negligence. I find also that LaPorte's operation of the mail truck did not contribute to the accident and hence the plaintiff's complaint against the defendant United States of America and the defendant Staffe's claim against it should be dismissed.

The plaintiff suffered serious and crippling injuries as a result of the accident. She was confined in the Flushing Hospital, where she remained for nine days. The hospital report and the testimony reveal that she sustained lacerations of the right forehead, face, eyelid and eyebrow requiring eighteen sutures; a laceration of the right arm also requiring sutures; a fracture of the head of the right fibula, with moderate displacement of the small proximal fragment; hematoma of the right knee; and an abrasion of the right forearm. A plaster cast was applied to the right leg, extending from the thigh to a point above the ankle. On October 31, 1950, additional X-rays were taken and Dr. Spier, who took them, testified that, in addition to the injuries described above, he found that as a result of the accident she had sustained fractures of the second and third cervical and fifth lumbar vertebrae, a fracture of the symphysis pubis of the pelvis, running through the bone as well as the cartilaginous junction, causing a displacement of pubic bones and various nerve and tendon involvements.

Prior to the accident the plaintiff had been employed as an airline hostess for Trans-World Airlines, International Division. She received a salary of $270 a month. Because of the injuries sustained in the accident she was unable to work from August 17, 1950, until December 4, 1950, a period of 108 days. However, she had accrued 70 days sick leave so that her actual damage was her loss of pay for the remaining 38 days. She was placed on sick leave again in February, 1952, and terminated her employment on April 21, 1952. I disagree with her counsel's contention that she was obliged to leave her employment by reason of the accident. It is my opinion that she left her employment because of her desire to remain in Los Angeles with her husband, who was employed there. Since August 21, 1952, she has been employed as an office worker at a salary of $210 per month. The plaintiff incurred medical expenses aggregating $633.96.

Testimony and observation at the trial disclosed that as a result of the accident she had three scars about her right eye, one of them about 1½ inches long, another about 1 inch long, a scar about ½ inch long on her right arm; 1½ inch scar on the lower part of the right leg and ½ inch scar below the kneecap. She is obliged to walk with a slight limp. According to uncontroverted medical testimony the injuries which she sustained are permanent and her condition may grow worse. She testified that she suffers considerable pain, is unable to stand or walk for any length of time and cannot perform the usual household duties.

■ I find that the plaintiff by reason of her personal injuries and the pain and suffering, both past and future resultant therefrom, her hospital and medical expenses, loss of earnings, and the impairment of her ability to work and earn money in the future has been damaged to the extent of $35,000, and I accordingly direct judgment in her favor against the defendant Staffe in that amount.

Submit findings of fact and conclusions of law in conformity herewith.