Janice Marian CHAVEZ, Plaintiff,

v.

UNITED STATES of America, Defendant.

Darryl SORENSON, a minor, by and through Lois G. Sorenson, his Guardian ad Litem, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 253, 254.

United States District Court
D. Montana,
Billings Division.

March 9, 1961.

Sandall, Moses, Cavan & Battin, Billings, Mont., for plaintiffs.

Krest Cyr, U. S. Atty., Butte, Mont., and John F. Blackwood, Asst. U. S. Atty., Billings, Mont., for defendant.

JAMESON, District Judge.

These two actions, consolidated for trial, are prosecuted under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680, inclusive, for damages for personal injuries sustained by the plaintiffs on June 6, 1959, as the result of a collision at the intersection of 1st Avenue South and South 34th Street in the City of Billings, Montana, between a mail truck owned by the defendant and operated by William Folkerts, and a motor bike being driven by the plaintiff Janice Marian Chavez on which the plaintiff Darryl Sorenson was riding. The motor bike was proceeding in an easterly direction on 1st Avenue South, and the mail truck, after proceeding westerly on 1st Avenue, was making a left turn into 34th Street. Plaintiffs contend that defendant's driver was negli-

gent in (1) failing to keep a proper lookout; (2) failing to signal his intention to turn to the left; (3) suddenly and abruptly turning to the left of the center line of the street being entered; and (4) failing to yield the right of way to plaintiffs' vehicle, which was within the intersection or so close thereto as to constitute an immediate hazard. Defendant denies that its driver was negligent in any of the particulars alleged and alleges as a separate defense in each case that any injury sustained by the plaintiff was caused in whole or in part or contributed to by the negligence of the plaintiff. In the Sorenson case defendant also relies upon the defense of assumption of risk.

First Avenue South is a "through" or "stop" street. It intersects with 34th Street South on the south side of the avenue, but there is no intersecting street to the north. On the southwest corner of the intersection there is a Texaco filling station and on the southeast corner, a Chevron filling station.

There is little, if any, dispute with respect to the point of impact. An officer of the Billings Police Department who investigated the accident before either vehicle had been moved, fixed the point of impact near the curb line on the south side of 1st Avenue, 19 feet 1 inch from the east curb of 34th Street and 29 feet 8 inches from the west curb. 34th Street is 48 feet 9 inches wide. The vehicles came to rest 20 feet 4 inches south of the point of impact, with the truck headed almost due south and the motor bike and plaintiff Chavez partially under the front of the truck. The police officer testified that he fixed the point of impact from the debris, that there were light skid marks between the point of impact and point of rest, and that the motor bike had been dragged sideways. An ex-

hibit containing the officer's measurements was received in evidence without objection. The other witnesses corroborated substantially the point of impact as determined by the officer.[1]

It is clear from the testimony and exhibits that at the point of impact plaintiff's motor bike was more than half way across the intersection and that the right side of the truck was at least five feet east of the center line of 34th Street.

It is undisputed that the motor bike, driven by the plaintiff Chavez and on which the plaintiff Sorenson was riding, was proceeding easterly on 1st Avenue at a speed of 20 to 25 miles an hour and was traveling near the curb line on the south side of the avenue. It is likewise undisputed that the mail truck had been proceeding westerly on 1st Avenue in the south driver's lane on the north side of the avenue. Plaintiffs testified that the truck did not stop before making the turn into 34th Street and that they did not see any signal of the driver's intention to turn to the left. They are corroborated by Carolyn Muhlbeier who was in her car, facing east, at the Texaco station on the southwest corner of the intersection. Folkerts testified that he came to a stop, with his light indicating a left turn, that he was stopped from one-fourth to one-half a minute to permit east bound traffic on 1st Avenue to proceed, and that after the last vehicle passed, he proceeded to turn. With respect to Folkerts' stopping, with his signal light indicating a left turn, Folkerts was corroborated by Frank J. McHale, who testified that he had been traveling east on 1st Avenue South at a speed of 15 to 20 miles an hour, turned to the right into 34th Street, crossed the street, and had cleared the sidewalk and was on the driveway of the Chevron station on the southeast corner of the intersection

1. While Folkerts, defendant's driver, had testified in his deposition that the impact occurred *west* of the center line of 34th Street and had drawn a sketch of the scene of the accident indicating that his turn and the point of impact were both west of the center line, at the trial he drew another sketch and also corrected his initial sketch to place the point of impact a short distance *east* of the center of 34th Street and indicating clearly that no part of the truck was at any time west of the center line.

when he heard the crash of the collision. He had not seen plaintiff's motor bike through his rear view mirror. I am inclined to accept the testimony of Folkerts and McHale that Folkerts stopped before making the turn, but for the reasons hereinafter set forth I do not believe that a finding on this point is necessary to a determination of the question of liability.

Defendant argues that plaintiff's motor bike struck defendant's truck. Aside from Folkerts' initial statement to that effect, there is no evidence to support this conclusion.[2] From an examination of the motor bike itself, the pictures received in evidence, and the testimony, I must conclude that the right front fender of the truck struck the motor bike on its left side about one-third of the way from the front.

Folkerts testified that he saw the bike for the first time after he had commenced his turn and was going "at most 15 miles an hour". On direct examination he said that he did not see the bike "until just before the impact". On cross examination he testified that when he first saw the bike it was "probably 15 or 20 feet" from him although he is "not good at gauging feet". The bike "was not at the intersection as yet when I first saw it. It was nearing it but not at it".

Defendant contends that it was "physically impossible for the truck driver to see the bike approaching the intersection" by reason of the fact that it was so close behind the McHale car and so near the curb. This contention is without merit. It is clear from McHale's testimony that McHale had turned into 34th Street, crossed that street, "cleared the sidewalk", and entered the driveway when the vehicles collided some 19 feet west of the east curb line.[3]

2. After examining the motor bike at the trial Folkerts, on cross examination, testified in part:

"Q. Looking at that bicycle do you see damage occurring in approximately the center of the bicycle to the motor and to the gas tank? A. That seems to be about right, that is true.

"Q. Do you see any equivalent damage in the front end of the vehicle? A. Well, the bumper damage at this point.

"Q. Are you indicating you think the bumper probably hit on the rear fender of the front wheel, is that correct? A. I believe that she may have tried to make a turn at the moment she saw me and the bicycle may have been somewhat over to the side.

"Q. Which would indicate that the right front of your vehicle actually struck the motor bike approximately under the handle bar, isn't that correct? A. That is what it would look like.

"Q. And from that, which again is physical evidence, would you not say your truck struck the bike? A. Well, the evidence, it kind of looks that way, yes.

"Q. Do you still believe that that bicycle pushed your truck over? A. Well, by the looks of that it doesn't seem it is probable.

3. Folkerts' own testimony does not support defendant's contention that it was physically impossible for Folkerts to see the bike approaching the intersection.

On cross examination he testified in part:

"Q. What obstructed your vision? A. After the last?

"Q. Before the motor bike entered the intersection? A. There was not anything obstructing my vision after the last car passed.

\*    \*    \*    \*    \*    \*

"Q. You have testified that the last car passed through the intersection? A. That is right.

"Q. Before you attempted to make your turn? A. That is right.

"Q. By that time the motor bike had not approached the intersection, had it? A. It was not at the intersection yet, no.

"Q. After that car you allowed to pass did pass through the intersection what was there between you and the motor bike which would have obstructed your view? A. There wasn't any physical object in front, no.

"Q. You just did not see it, did you? A. I did not see it before I made my turn, no.

"Q. Did you look? A. I looked. I kept looking there for a long time. It must have happened they came into view about the time I made my turn. I did not see them.

"Q. What do you mean, came into view? Do you have any trouble with your eyes? A. Not at all.

"Q. And you can see for a block or so? A. I still contend they came—

Right of way ordinances of the City of Billings, Montana, provide in pertinent part:

"The driver of a vehicle intending to turn at an intersection shall do so as follows:

\* \* \* \* \*

"(b) Left turn at two-way street. At any intersection where traffic is permitted to move in both directions on each street entering the intersection, an approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered. Whenever practicable the left turn shall be made in that portion of the intersection to the left of the center of the intersection." (Section 21.87, subparagraph (b), The Code of the City of Billings, Montana, 1956.)

"The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but the driver, having so yielded and having given a signal when and as required by this chapter, may make such left turn and the drivers of all other vehicles approaching the intersection from the opposite direction shall yield the right of way to the vehicle making the left turn." (Sec-

tion 21.96, The Code of the City of Billings, Montana, 1956.)

The evidence, including Folkerts' own testimony on cross examination, clearly establishes a violation of section 21.87, subparagraph (b) in that defendant did not make his "left turn \* \* \* so as to leave the intersection to the right of the center line of the roadway being entered" (i. e. 34th Street). Had defendant's truck entered 34th Street to the right or west of the center line, it seems probable that the bike would have passed the center line before the truck arrived at the south curb line of 1st Avenue and there would have been no collision.

Based upon the measurements of the police official and the position of the vehicles after the collision, the motor bike, at the point of impact, had traveled 29 feet 8 inches (plus approximately one-third of its length) into the intersection. The evidence does not disclose the exact distance traveled by defendant's truck after stopping or starting to turn. The point of impact of course was 19 feet west of the east curb line and the truck had traversed the south half of 1st Avenue, but the actual distance traveled would depend somewhat upon the angle of the turn. As noted above, Folkerts testified that he did not see the bike until he had commenced his turn. On direct examination he said this was "just before the impact"; on cross examination, that the bike was not yet within the intersection but was "nearing it". Under the physical facts and Folkerts' own testimony it is my conclusion that the motor bike was so close to the intersection "as to constitute an immediate

they were a lot closer to the vehicle than the previous vehicle. They must have been because I would have seen it sooner.

"Q. Then let's go over this again. This vehicle you are talking about had passed through the intersection? A. That is right.

"Q. And these people had not even come into the intersection, had they, at the time that vehicle had passed through the intersection? A. They were not at it yet, no.

"Q. So that there was nothing between you and them which would have obstructed your view, and certainly that vehicle could not have obstructed your view because it had passed through? A. After it was gone, yes.

"Q. So that there was nothing between you and the Moped bike to obstruct your view, was there? A. Nothing then. If I hadn't looked on 34th I would have kept looking straight ahead to see oncoming traffic."

hazard" when the truck turned to the left. This would be true whether, as plaintiff contends, the truck did not stop at all, or as defendant contends, it stopped and signaled a left turn. If it did stop and permitted other vehicles to proceed easterly on 1st Avenue, a driver in plaintiff's position could reasonably assume that it would remain stopped to permit the motor bike to proceed through the intersection.

The Supreme Court of Montana had under consideration a somewhat comparable situation in Marsh v. Ayers, 1927, 80 Mont. 401, 260 P. 702, involving a collision between plaintiff's motorcycle and defendant's truck. There, as here, the two vehicles were approaching from opposite directions, and defendant's truck was making a left turn into an intersecting street. The court held that both parties had the duty "to keep a lookout ahead; not only to look, but to 'look in such an intelligent and careful manner as to enable him to see the things which a person in the exercise of ordinary care and caution for his own safety and the safety of others would have seen under like circumstances' (citing case); and he could not escape the penalty of his negligence by saying that he did not see that which was in plain sight (citing case)." 80 Mont. 410, 411, 260 P. 705.

The court held further, however, that as to what they were "bound to see" the parties did not stand in the same position. In holding that the driver of defendant's truck was "bound to see" plaintiff's motorcycle, the court said in part:

"The defendant, intending to turn from Montana Street into Mercury Street, was required by the traffic regulations * * * to 'keep to the right and swing full around the intersection of the center line of the street,' and to then see that there was no vehicle properly progressing along either of the intersecting streets with which the truck would collide, operating his car with that degree of care consistent with existing conditions (Huddy on Automo-

biles, 8th ed., 478, and cases cited). When, however, the defendant elected to turn short of the intersection and enter the wrong side of the street, he was at fault (Savage v. Boyce, 53 Mont. 470, 164 P. 887), and that act itself constituted negligence per se (Knott v. Pepper, 74 Mont. 236, 239 P. 1037); he was chargeable with the additional duty of seeing any vehicle which would not have been placed in a position of danger had he made a lawful left-hand turn. As the plaintiff was traveling in the exact place where he was required by law to travel, the defendant was, under the circumstances, 'bound to see' the plaintiff's motorcycle; this he did not do." 80 Mont. at page 411, 260 P. at page 705.

It is my conclusion that the driver of defendant's truck was negligent (1) in failing to keep a proper lookout; (2) in failing to make a left turn in such manner as to enter 34th Street to the right of the center line; and (3) in failing to yield the right of way to plaintiffs, and that such negligence was the proximate cause of the collision and resulting injuries to plaintiffs.

Defendant contends that plaintiff Chavez was guilty of contributory negligence in (1) failing to yield the right of way under section 21.96 of the ordinances of the City of Billings; (2) approaching the intersection at an excessive speed; (3) failing to keep a proper lookout; (4) failing to have the motor bike under proper control; (5) following too closely behind the McHale car; and (6) in two persons riding on the motor bike in violation of law. Defendant contends that by reason of Sorenson's ownership of the motor bike and his presence thereon, the negligence of the driver was imputable to him and that in any event he assumed the risk of injury by voluntarily assuming a dangerous position on the bike.

Many of these contentions have been considered in discussing the

questions relating to defendant's negligence. In particular I have concluded that plaintiffs had the right of way under section 21.96 and that the evidence fails to sustain defendant's contention that plaintiffs were traveling too closely behind the McHale car. Nor does the evidence support a conclusion that the collision was caused by plaintiffs' excessive speed.[4] As plaintiffs approached the intersection they had a right to assume that defendant's truck would yield the right of way and make a lawful turn into South 34th Street.

In the recent case of Jessen v. O'Daniel, 1960, 349 P.2d 107, 113, the Supreme Court of Montana considered the question of contributory negligence arising from ignoring obvious danger or failing to exercise ordinary care after observing that another driver was not going to perform his duty. The court approved the following instruction:

"A person who, himself, is exercising ordinary care has a right to assume that others, too, will perform their duty under the law, and he has a further right to rely and act on that assumption. Thus it is not negligence for such a person to fail to anticipate injury which can come to him only from a violation of law or duty by another."

The court held further that in a proper case this rule is qualified by one of the following instructions:

" 'However, certain circumstances qualify the foregoing rules as follows: A person does not have the rights which they define when it is reasonably apparent to him, or in the exercise of ordinary care would be apparent to him, that another is not going to perform his duty.

" 'One is not justified in ignoring obvious danger although it is created by another's misconduct, nor is he ever excused from exercising ordinary care.' (1 Cal.Jur.Inst.Civ.4th, No. 138, p. 334.)"

When the plaintiff Chavez saw the truck was making a left turn into 34th Street she was of course obligated to do what she could to avoid a collision. She testified that she had seen the truck traveling west on 1st Avenue but did not realize it was going to make a left turn until shortly before the collision when she tried to turn to the right. Considering the position of the two vehicles and the time involved in "reacting" to the danger, it cannot be said that the plaintiff Chavez was negligent. The rule here applicable was well stated in Marsh v. Ayers, supra:

"Even had the evidence been as counsel state it on this point, what could ordinarily be done would not be controlling in the second of time in which plaintiff had to make a choice; thus confronted by the peril raised by the sudden appearance of the truck, plaintiff was not required to act unerringly, but only to make such a choice as, under the circumstances, a reasonably prudent man would have made. (Citing cases.)"

Sorenson was riding on the luggage rack of the motor bike. Defendant argues that both plaintiffs were negligent in violating R.C.M.1947, § 32-21-105 which provides:

"A person operating a motorcycle shall ride only upon the permanent and regular seat attached thereto, and such operator shall not carry any other person nor shall any other person ride on a motorcycle unless such motorcycle is designed to carry more than one (1) person, in which event a passenger may ride upon the permanent and regular seat if designed for two (2) persons, or upon another seat firmly attached to the rear or side of the operator."

---

4. The only evidence of plaintiffs' speed was that of plaintiffs themselves. Sorenson testified that they had been traveling at a speed of 20 to 25 miles an hour.

Mrs. Chavez testified that they did not travel over 20 miles an hour at any time on 1st Avenue South.

Even though plaintiffs were negligent in violating this statute, the evidence does not sustain a finding that their negligence was the proximate or contributing cause of the accident.[5]

Damages sustained by Darryl Sorenson.

██ In the case of an injury to a minor, there arise two causes of action,— one in favor of the minor under R.C.M. 1947 § 93-2805, and the other in favor of the parents under § 93-2809. See Burns v. Eminger, 1929, 84 Mont. 397, 276 P. 437. Here, the plaintiff, without objection, in effect has combined the two causes of action, including in the prayer for damages the medical and hospital expense, which would ordinarily be a claim of the parents.

Darryl Sorenson was 14 years of age at the time of the accident and a sophomore in high school. He sustained a displaced fracture of the middle third of the left femur and had lacerations on his shoulder and back which left scars. Immediately after the accident he was hospitalized for ten days, where he was in traction for several days, followed by surgery whereby the fractured bone was fixed in proper position through insertion of an intramedullary nail. He was required to use crutches for five months after his release from the hospital. Approximately one year after the accident he was returned to the hospital for an additional day and night, when the nail was removed from his leg. There is no question that he suffered considerable pain and discomfort.

According to the attending physician, at the time of trial on October 3, 1960, the fracture was well healed and in good position, with no appreciable disability. Darryl had lost no schooling and there is no claim for any loss of earnings.

Darryl's medical and hospital bills amounted to $849.30. His motor bike was damaged beyond repair. It had been purchased six weeks prior to the accident for $189.

██ Under the Montana law the measure of damages "is the amount which will compensate for all the detriment proximately caused" by the accident, "whether it could have been anticipated or not". Section 17-401, R.C.M. 1947. In personal injury actions there is no measuring stick by which to determine the amount of damages to be awarded and each case must depend upon its own peculiar facts. Pfau v. Stokke, 1940, 110 Mont. 471, 103 P.2d 673, 674; Jewett v. Gleason, 1937, 104 Mont. 63, 65 P.2d 3; Wilson v. Northland Greyhound Lines, D.C.Mont.1958, 166 F.Supp. 667; 1938, 15 Am.Jur. 480, Damages § 71.

██ Aside from the medical and hospital expenses totaling $849.30, there is no accurate measurement for the recovery of damages for the personal injury sustained by Darryl. An allowance may be made for mental and physical pain and suffering. Bourke v. Butte Electric & Power Co., 1905, 33 Mont. 267, 83 P. 470.

██ In my opinion $1,250 in addition to the medical and hospital expenses of $849.30 and loss of motor bike in the sum of $189 or a total of $2,288.30 will fairly compensate Darryl Sorenson and his parents for the injury sustained and the expenses incurred. It is understood that this sum will cover both the child's cause of action, pursuant to Section 93-2805, R.C.M.1947, and the parents' cause of action, pursuant to Section 93-2809.

Damages sustained by Janice Chavez.

Janice Chavez, who was 22 years of age at the time of the accident, had been married in April, 1956, and divorced in December, 1957. She has two children, a boy four and one-half years old and a girl three years old, who are dependent upon her for support.

According to Dr. William H. Walton, the attending physician, Mrs. Chavez' injuries consisted of a compound comminuted fracture of the left femur, with a large gaping wound four to six inches in length and three inches in width in

5. See Suarez v. Katon, 1941, 200 Mich. 38, 209 N.W. 796; Elliott v. Zellar, 192 Misc. 350, 80 N.Y.S.2d 319.

the middle third of the leg; "possibly six pieces of glass" in her left knee joint; a fracture of the upper end of the left tibia; a fracture of the bone in the left foot; a "multitude of lacerations"; shock and loss of blood, which required blood transfusions on June 6 and 7.

Surgery was performed on June 6, the day of the accident, followed by a second operation six days later. Mrs. Chavez was in traction until July 30, 1959, when she was placed in a spica cast extending from her chest and covering the left leg, and was released from the hospital. She returned to the hospital on September 27 when the cast was removed, and she started using a walking leg brace. She remained in the hospital until October 9, receiving daily physical therapy treatments. Following her release from the hospital on October 9, she continued her physical therapy treatments at the hospital daily until October 30 and weekly thereafter until April 18, 1960. She wore the leg brace until sometime around the 1st of January, 1960, and then started using crutches, which she discarded sometime in March, 1960. Dr. Walton found that she was "doing quite well without crutches" in an examination which he made on April 18, 1960.

In his most recent examination before the trial Dr. Walton found an increase in the amount of crepitation in the left knee, indicating a roughening of cartilage and possibly arthritis. It was his opinion that there was a "fairly good chance of having to have the kneecap removed". If so, Mrs. Chavez would be hospitalized from three to ten days, required to wear a cast for three or four weeks, with another three or four weeks before she would be sufficiently strong to get about in the usual fashion.

According to Dr. Walton the left leg is somewhat shorter and the alignment is not perfect. Taking into consideration the condition of the leg, knee and foot, he estimated a 20% to 40% disability in the left leg and a 16% disability of the body function as a whole.[6] The knee will not improve without surgery and might get worse. The future outcome depends to some extent on the outcome of the knee injury, whether Mrs. Chavez gains weight, and whether she continues her present occupation "involving constant standing". Dr. Walton would expect the present "lassitude" of which Mrs. Chavez complains to disappear within a year or two. On redirect and re-cross-examination he distinguished between "lassitude" and "fatigability" stating that the latter is related to the physical condition of the leg itself. Dr. Walton found Mrs. Chavez a very cooperative patient who "worked like a demon to get well".

Mrs. Chavez has a pronounced disfiguring scar on the left thigh, and lesser, but noticeable, scars on her left leg and abdomen, all of a permanent nature. There is no question that she suffered pain over a protracted period and that during a portion of the time it was of a severe nature.

With reference to the subjective symptoms, Mrs. Chavez testified that she tires easily, has to sit down frequently in her work as a beauty operator, limps when tired, her children upset her, "everything" makes her nervous, her knee sometimes buckles, and her legs ache

---

6. On direct examination Dr. Walton testified in part:

"Q. So that there will always be some limitation on her ability to perform work as a beautician? A. I would say yes.

"Q. Do you have any idea how much limitation that might be? A. Since I do not know the duties of a beautician and the entire working structure—

"Q. Assuming it is an occupation that requires long periods of standing, short periods of sitting? A. Yes.

"Q. And working from ten or eleven or twelve hours for five days a week? A. I really couldn't give you a percentage estimate as to what her degree of impairment, because unquestionably a part of that is associated with the season of the year, weather changes, other phenomena. A rough estimate would probably be ten or fifteen or twenty per cent as compared to a normal individual."

On redirect examination he made a "rough estimate" of 16%.

when the weather changes. Prior to the accident she was fond of dancing, swimming and roller-skating. By reason of the disfiguring scar, she has not participated in swimming in public since the accident, is unable to roller-skate, but is able to dance. She is less interested in all social activities, but "sometimes goes to dances".

Mrs. Chavez was in the hospital a total of approximately 66 days. Her medical and hospital bills to the date of trial amounted to $2,921. The medical and hospital bills incident to the knee operation, if required, would amount to approximately $460.

Mrs. Chavez is a beauty operator. She attended a beauty operator's school in 1956 and obtained her license in 1957. Immediately thereafter she was employed for approximately eight months. She gave up her employment by reason of the birth of her second child and had not been employed again up to the time of the accident. At that time she was obtaining assistance from the State Public Welfare Department.

Mrs. Chavez resumed employment as a beauty operator in March, 1960, and has been earning on the average of $45 a week. She works an eight-hour day, but testified that beauty operators usually work from ten to twelve hours to accommodate working women after regular working hours. She tires easily and her back bothers her, requiring her to sit down frequently.

When she was employed in 1957 she worked eight hours a day five days a week and her earnings were less than after she resumed employment in 1960. She is not making any claim for loss of earnings but rather for loss of earning capacity. Her employer testified that she was a good worker except for her physical condition and should be able to earn twice as much if she could work a twelve-hour day; that by reason of her physical condition it was sometimes necessary to arrange with one of the other girls to handle clients, with the result that another less experienced girl earned more than

Janice. When the earnings records were checked, however, it was found that both girls had been earning approximately the same amount, each working a five-day week with different days off. Janice testified that business had been slow during the preceding month, and the earnings statement indicated that for that month her earnings had been substantially less than two or three months earlier. Her failure to earn the "potential" amount suggested by her employer was not accordingly due entirely to her inability to work the long hours required for maximum earnings.

Plaintiff claims that as a result of her accident she will be unable to perform all of her household duties and that it will be necessary to hire help until her daughter is about twelve years of age. For this damage she seeks $5 per week or a total of $2,000. Damages may include "reasonable expenses for substitute help hired by the injured person to do his work; to the extent that claim for this is made, there cannot be recovery for loss of time". Restatement Torts § 924, Comment on Clause (c)f. In effect plaintiff seeks recovery both for her inability to work some ten to twelve hours a day and for her help with household duties. I do not feel that any special award should be made for extra help which may be necessary but that this should be considered with other factors in determining the award for general damages.

During the period Mrs. Chavez was in the hospital her mother took care of the two children and after Mrs. Chavez' release from the hospital, continued the care of the children and assisted in Mrs. Chavez' care. Plaintiff seeks $10 a day or a total of $2,700 for 270 days for these services. There is no contention that this amount has been paid or that Mrs. Chavez is legally obligated to make the payment. There is a conflict in the authorities with respect to liability for the value of services rendered gratuitously, particularly by mem-

bers of the family.[7] Neither side has cited any Montana cases in point and I do not find that the Supreme Court of Montana has passed on this question. Obviously it was necessary to make provision for the children during Mrs. Chavez' hospitalization and subsequent disability. While under the circumstances I think the amount claimed is high, the need to provide help for the children will be considered in arriving at the amount of the award.

As both counsel state in their post-trial briefs, Mrs. Chavez is an attractive young woman. Fortunately, there were no scars on her face or other parts of her body which are visible when she is wearing regular clothing. Were she a professional dancer or similarly employed, the scar on her thigh would afford a basis for a substantial recovery. While the scars would no doubt cause embarrassment in swimming and accordingly interfere with her enjoyment of that form of recreation, they are not comparable to facial scars or even scars on arms, neck, shoulders or lower extremities which are visible at all times.[8]

Defendant questions any right of recovery for impairment of earning capacity in view of the fact that Mrs. Chavez was not working at the time of the accident, and when she did work at the same occupation she received less compensation than she earned subsequent to her injury. It is true, of course, that loss of earning capacity is usually established by showing a reduction in the amount earned before and after the accident. As the Supreme Court of Montana said in Cornell v. Great Northern Ry. Co. et al., 57 Mont. 177, 189, 187 P. 902, 905: "Mortality tables are competent evidence to aid * * * in determining the probable duration of plaintiff's life, and hence * * * by comparing his earnings before and after the injury complained of, to ascertain the amount which will compensate him for his loss by reason of the impairment of his earning capacity."[9] There is no mathematical formula, however, for gauging probable loss of earnings or the monetary value thereof. The court must consider probabilities, both favorable and unfavorable, based upon evidence adduced at the trial and reduce to present value the anticipated loss of earnings in the future.[10]

The mere fact that Mrs. Chavez was not working at the time of the accident would not preclude recovery for loss of earning capacity. It is, of course, a factor to be considered as is the fact that when she worked prior to the accident at the same occupation her earnings were less than they were at the time of trial. On the other hand, the court must consider also that when she worked before it was her first ex-

---

7. See Restatement Torts § 924, Comments on Clause (c)f where it is stated that, "The injured person is entitled to damages for all expenses and for the value of services reasonably made necessary by the harm." 25 C.J.S. Damages § 47b, p. 527; 15 Am.Jur. 615, Damages § 199.

8. It should be noted that all of the cases cited by counsel for plaintiff involved an award which included damages for facial injuries and scars. See Huffman v. Home Owners' Loan Corporation, D.C. Mo.1941, 39 F.Supp. 139; Snyder v. United States, D.C.Md.1953, 118 F.Supp. 585, affirmed United States v. Guyer, 4 Cir., 218 F.2d 266; Pittman v. B. & L. Concessions, Inc., D.C.Mo.1950, 90 F. Supp. 666; Bologach v. United States,

D.C.Pa.1954, 122 F.Supp. 502; Higgins v. United States, D.C.N.Y.1953, 114 F. Supp. 499.

9. The court continued: "If the impairment is permanent, the loss will continue throughout life; and hence his damages should be fixed at such a sum as will reasonably compensate him for his loss, making allowance for any diminution in his earning capacity which may be due to causes other than the injury, such as advancing age, the apparent state of his health at the time of the injury, his habits of life, the possibility that he might or might not have been engaged in continuous remunerative employment, and the like."

10. See Restatement, Torts § 912, Comment b, § 924, Comments d and e.

perience as a beauty operator, and by reason thereof her earnings would naturally be less. The proof of loss of earning capacity is far from satisfactory, but all the evidence relating thereto must be considered.[11] Moreover, under the Montana law a person may recover from a tort feasor both compensation for loss of earning capacity and for the destruction of the capacity to pursue an established course of life.[12]

It should be noted also that it is not necessary to prove the extent of damages with the same definiteness as the proximate cause of the injury. The following comments in Restatement, Torts § 912, Comment *a* (1939) are pertinent: "It is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful conduct of the person charged. It is desirable likewise that there should be definiteness of proof as to the amount of damages as far as reasonably possible. It is even more desirable, however, that an injured person shall not be deprived of substantial compensation because he cannot prove with complete certainty the extent of harm he has suffered  *  *  *"

It is my conclusion that the sum of $22,500 will constitute a fair award for the injuries sustained by Mrs. Chavez, including pain and suffering, loss of earning capacity, permanent disability, scars, services for care of children and housework, and medical and hospital expenses including expenses which may be incurred in the future.

Pursuant to Rule 11 of the local rules of court, plaintiff will prepare, serve, and file proposed findings of fact, conclusions of law, and judgment in accordance with this decision.

11. This case is distinguishable from Robinson v. F. W. Woolworth Co., 80 Mont. 431, 449, 261 P. 253, 260, where there was no evidence to show "how much plaintiff's earning capacity was diminished or that it was diminished at all".

12. See Montague v. Hanson, 38 Mont. 376, 386, 99 P. 1063; Mullery v. Great Northern Ry. Co. et al., 50 Mont. 408, 148 P. 323; Wilson v. Northland Greyhound Lines, supra.